A. H. D'ALEMBERTE, GEORGE W. WARD, J. R. WELLS, J. M. MILLER, MILTON PLEDGER, TOM SHULER AND C. D CLARK, *Plaintiffs in Error,* v. STATE *ex rel.* D. H. MAYS, *Defendant in Error.*

1. The rights of a candidate which arise under, and are created by the primary election laws of the State of Florida, are such that when violated the courts of this State may be resorted to for their enforcement, and the writ of mandamus may be used to compel the performance of the duties which are imposed by law upon the members of the Congressional or Standing Committee of a political party, in a Congressional District.

2. The duties imposed by law upon the members of the Congressional or Standing Committee of a political party in a Congressional District are ministerial, or at most but *quasi* judicial, and in canvassing the vote, such committee has under the constitution and laws no exclusive or ultimate power to pass upon the question whether a vote cast at a primary election was legally cast, for that is a judicial question.

3. It is the duty of the courts not to condemn a law as unconstitutional, if a construction favorable to its constitutionality can be given, without violating the plain intent of the legislature, and this rule applies to primary election laws.

4. Under the constitution of Florida the legislature has no power to create canvassing committees or boards with final judicial power to pass upon purely judicial questions arising under the primary election laws.

5. Section 260 of the General Statutes of 1906 provides the only occasion when, and the method by which, the right of a person to vote at a primary election can be questioned, and this is to be done at the time such person offers to vote. The inspectors *then* hear the evidence and *then* determine for or against the rights of persons offering to vote, as the evidence shall reasonably warrant. This is a necessary ministerial or *quasi* judicial power, without which no orderly election could be held, but does not exclude proper judicial inquiry.

6. Section 263 of the General Statutes of 1906, provides that the report by the officers holding an election to the committee (county) shall be in writing accompanied by the original ballots and poll list, and the reasons on which any challenged vote was received or rejected. This was intended to preserve the evidence of what occurred at the polling places, for the consideration of the committee, and does not authorize it to seek or take evidence outside of the returns and reports *so far as the legality of any vote is concerned.*

7. Under section 8, Chapter 5613 Laws of 1907, a Congressional Committee in a case of protest are only authorized to *review* the findings and decisions of a County Committee, and have no authority to take testimony outside the returns made to it by a County Committee as to the legality of a vote cast at a primary election.

8. The decisions and rulings of committees are not to be construed as *final* in the sense that such rulings are absolute to the exclusion of judicial inquiry. The word *"final,"* used in these connections, may be understood as meaning that such

decisions and rulings when made are *final* as to the committee making them, so that there shall be no delay in the canvass of the vote.

9. The primary election law imposes upon inspectors and committeemen very important public functions, in the proper and prompt discharge of which the public has an interest and these duties can not be intentionally and unnecessarily shirked or avoided without incurring liability, and such responsibility cannot be avoided by the appointment of proxies simply to avoid trouble and expense.

This case was decided by the court En Banc.

Writ of Error to the Circuit Court for Leon County.

### Statement.

On the 27th of July, A. D. 1908, an alternative writ of mandamus was issued by the Honorable John W. Malone Judge of the Circuit Court in and for Leon County, on the relation of Dannitte H. Mays against fourteen persons, including the plaintiffs in error, reciting in substance:

First: That the Democratic Party in the State of Florida, acting under the provisions of Chapter 5014, Acts of 1901, Laws of Florida, entitled "An Act to Regulate the Holding of Political Primary Elections in the State of Florida for Nominating Candidates for any Office under the Laws of this State, and for Nominating Delegates to Political Conventions," and the amendments thereto, duly called a primary election to be held in the Third Congressional District of the State of Florida, on May 19th, 1908, for the purpose of nominating a candidate for said District for the House of Representatives of the United States Congress to be presented on behalf

of the Democratic Party to the voters of said Congressional District at the general election to be held in the State of Florida on the Tuesday next succeeding the first Monday in November, 1908, and provided in said call for a second primary election to be held on June 16th, 1908, in said District, in the event no candidate before said primary to be held on May 19th, 1908, should receive a majority of the votes cast at said election.

Second: That relator Mays, J. Walter Kehoe, J. C. F. Griggs and Jefferson D. Stephens all citizens of Florida and residing within said Congressional District, duly qualified as candidates before said primary election held on May 19th, 1908; that on the —— day of May, 1908, the Democratic Congressional Committee for said Congressional District met at the city of Tallahassee and canvassed the returns of said primary election and declared that no candidate having received a majority of the votes polled in said primary election for the nomination to the office of Member of the House of Representatives from said District of the Congress of the United States; that a second primary election should be held in said District on the 16th day of June, 1908, to nominate a candidate for said office; that relator and J. Walter Kehoe having received a greater number of votes in said primary of May 19th, 1908, than were cast for said Griggs and Stephens the said committee declared relator and said Kehoe should participate in the second primary for nomination to said office, and that in said second primary the voters should choose between relator and said Kehoe as the Democratic Candidate for said office.

Third: That on June 16th, 1908, the second primary election was held pursuant to the call and the statutes, and relator and said Kehoe were candidates for nomination for member of the House of Representatives of the Congress of the United States from said district.

Fourth: That said second primary election was held in pursuance of the statutes and the rules and regulations prescribed by the Executive Committee of the Democratic Party in the State, and that relator received in said second primary election a majority of the votes cast in said second primary for said position.

Fifth: That the Democratic County Executive Committees of the several counties of the District met in their respective counties after said second primary election and canvassed the returns from the several precincts in the several counties, and having completed the canvass duly certified the result of said primary election in the several counties to the Democratic Congressional Executive Committee for said Congressional District.

Sixth: That in said second primary election relator was chosen by a majority vote of all votes cast in said primary election in said District to be the candidate to be presented to the voters of said District on behalf of the Democratic party on said general election to be held in November, 1908, for member of the said House of Representatives; that the certificates made up and duly certified to by the several county Democratic Committees in the counties composing the said district, show relator was chosen by a majority of forty-nine votes of all votes cast at said second primary to be the candidate as aforesaid.

Seventh: That A. H. D'Alemberte, J. F. Poore, George W. Ward, J. M. Miller and J. Neil as proxy for J. M. Miller, Milton Pledger, Tom Shuler and J. F. Shuler as proxy for Tom Shuler, A. J. Alford, M. Bates, C. D. Clark, J. W. Henderson, S. M. Bolton, E. B. Bailey and Black Ashley constitute the standing or Executive Congressional Committee for the Third Congressional District in said State; that said D'Alemberte is Chairman of said committee; that it became and now is the duty of said Executive Committee to convene and canvass the

returns of said second primary election as the same were made up, completed and certified to said committee by the several county executive committees in the said several counties composing said District, and it became and is now the duty of said chairman to cause the name of relator to be certified to the several Democratic Executive Committees of each of said counties composing said District, as the successful candidate in said second primary election to be presented in behalf of the Democratic party of said State to the voters at said general election to be held in November, 1908, for Member of the House of Representatives from said District of the Congress of the United States; that relator has the right by virtue of his aforesaid majority of votes cast in said second primary, by virtue of the canvass of said returns so made up, completed and certified by the said several County Executive Committees by the said Congressional Executive Committee, and to the certification of his name to the said county committees, as the successful candidate to be presented on behalf of said Democratic party to the voters at the general election to be held in November, 1908, for said office.

Eighth: Relator informs the court that said Democratic Executive or Standing Committee for said District met in Tallahassee on the 25th of June, 1908, for the purpose of canvassing the returns of said second primary election, as the same were made up and certified to said committee by the said several County Democratic Executive Committees of said several counties of said District, but said Congressional Executive Committee refused to canvass said returns and the Chairman of said committee failed and refused to cause the name of relator to be certified to the county committees of said counties composing said District, as the successful candidate to be presented by the Democratic party for said office of Member of the

House of Representatives as aforesaid, notwithstanding relator had received a majority of all the votes cast in said second primary election for said office, and was thereby duly and legally chosen as the candidate of the said Democratic party, and said committee, without discharging their duty in this behalf adjourned to meet in the said city of Tallahassee on the 15th day of July, 1908.

Ninth: That said committee met on the 15th of July, 1908, in Tallahassee at which meeting J. Walter Kehoe filed before said committee his petition, which was filed with the chairman of said committee on the 8th day of July, 1908, alleging among other things, in substance, that he and relator were the only candidates at said primary election held on the 16th of July, 1908, and he was qualified to be a candidate for Congressman from said District; that he, Kehoe, received a majority of all qualified votes cast in said election for Congressman, but by reason of an utter disregard of the statutes providing for the nomination of candidate for said office, in the counties of Leon, Madison, Jefferson and Calhoun, in said petition more specifically set forth, there were a large number of illegal votes cast at said election for D. H. Mays, the opposing candidate, by persons not qualified electors, so that by counting and receiving the said illegal votes so cast for Mays, together with the legal votes cast for him, it was made to appear by the returns of said election that said Mays received a majority of the votes cast in said District, when in truth and fact, the protestor received in said election a majority of the legal votes cast therein for said office of Congressman; that if said illegal votes so cast for Mays be rejected and the polls purged of all illegal votes so cast, the result of said election as the same now appears from the returns based upon and including said illegal votes would be changed, and would leave petitioner a majority of all legal votes cast at said

election for said office of Congressman, and would entitle petitioner to a certificate of nomination from said committee; that said petition contained certain allegations entitled "Leon County Specification No. 1," which was withdrawn. In specification No. 2, it was alleged in substance that in precinct No. 5, in Leon county, there were but ten persons qualified to vote at said election, yet the inspectors at said precinct received, canvassed and returned fourteen votes from said precinct, all of which were received and canvassed for D. H. Mays; that at precinct No. 8 in Leon county, there were but nineteen persons qualified to vote in said precinct at said election, yet the inspectors received, canvassed and returned at and from said precinct nineteen votes for Mays and two for protestant Kehoe, and that in precinct No. 16 in Leon county there were but sixty-one persons qualified to vote, yet the inspectors received, canvassed and returned ninety-four votes, of which protestant Kehoe according to the canvass and return received thirty-one, and D. H. Mays sixty-three; that the said illegal votes in said precincts Nos. 5, 8 and 16 were cast, received and canvassed by and with the connivance, knowledge and consent of the inspectors, and said illegal voters, with a common design to disregard the law and to ignore the provisions of the statutes regarding the poll tax as a prerequisite to voting; that said petition contained certain allegations entitled "Madison County Specifications Numbers 3 and 4;" that specification No. 3 was withdrawn; that in specification No. 4 it was alleged that in precinct No. 3 in Madison county there were but eighty-five persons qualified to vote at said election, yet the inspectors received, canvassed and returned at and from said precinct one hundred and five votes, seventy-two for Mays and thirty for protestant Kehoe according to the canvass and return of said inspectors; that the illegal votes at said precinct No. 3 were

cast, received and canvassed by and with the connivance, knowledge and consent of the said inspectors and said illegal voters, with a common design to disregard the statute requiring a poll tax as a prerequisite for voting; that said petition or protest of Kehoe contained other specifications numbered 5, 6 and 7, which were withdrawn; that it was further alleged in said petition petitioner had been unable to examine the registration books in any of the precincts included in said protest, or procure copies thereof, save as specified, and that he had been unable to procure copies of the poll lists of any of said precincts; that prior to the canvass by the County Executive Committee of Leon and Madison Counties the protestant filed with the chairman of said committees protests, copies of which were filed with said petition, marked "F" and "G;" that it was further alleged in said protest or petition if forty-nine of the illegal votes so cast should be eliminated from the count it would change the result and leave protestant a majority of all the rest of the votes cast, returned and canvassed at said election, and entitle protestant to a certificate of nomination. Whereupon petitioner prayed that the polls of each of said precincts numbered 5, 8 and 16 in Leon county, and precinct numbered 3 in Madison county be purged by rejecting said precincts *in toto* in canvassing the returns of said counties, and by rejecting the returns from such other precincts as may be discovered have become tainted and vitiated through the illegal acts of the voters, inspectors or others as set forth in said petition. A copy of said petition as amended by elimination of said specifications is attached marked Exhibit "A" and made a part of the alternative writ.

Ninth: The relator further informs the court that he filed with said committee his motion to dismiss and strike said protest filed by Kehoe with the chairman on the 8th

of July, 1908, upon the grounds that said protest did not show that any of the matters set up as a basis of contest against illegal votes were made the subject of challenge or objection to any alleged illegal votes before the inspectors of election, and upon the further ground that the committee did not have the power to entertain a contest such as was then presented, which motion is attached to and made a part of the alternative writ marked Exhibit "B;" that the committee overruled said motion; whereupon relator moved to strike the specifications numbered from one to seven embraced in the protest filed by Kehoe on July 8, 1908, upon the grounds:

First: Said specifications were so general, vague and indefinite that each failed to show that the alleged irregularities affected the result of said election, or authorize any investigation by the committee.

Second: That none of the matters presented were made the subject of challenge or objection to any vote alleged to be illegal before the inspectors of election.

Third: That only three of the alleged matters of contest are based upon objections brought to the attention of the County Executive Committees before the votes were canvassed, and these are not shown to affect sufficient votes to change the result.

Fourth: That none of the objections to any alleged illegal votes, except in those counties were brought to the attention of the County Canvassing Boards before the votes were canvassed and these matters were not in those counties made the subject of objection before the inspectors of election.

Fifth: That it is not alleged that any particular illegal vote was cast for Mays.

Sixth: That the grounds set forth in said petition were not sufficient to authorize the rejection of the returns.

172     SUPREME COURT OF FLORIDA,

D'Alemberte, et al. v. State *ex rel.* Mays.—Statement of Case.

Seventh : That the petition did not set forth the names of the alleged illegal voters, nor did it specify the grounds of the alleged illegality and such voters with sufficient particularity; and

Eighth : That the committee did not have the power to entertain the contest or protest as presented. That said committee overruled said motion and disregarded the same.

Eleventh : Relator further informs the court that J. Walter Kehoe filed before the Democratic Executive Committee of Leon County on June —, 1908, his protest against the canvassing and counting of the returns of the primary election held on June 16th, 1908, from twelve precincts in said county, including precincts numbered 5, 8 and sixteen for the same reasons as have been heretofore set forth. The alternative writ then states the grounds of protest against the canvassing of the votes from the other precincts, but as they are not involved here the reasons are not given in this statement. The protest then states that the County Executive Committee of Leon county sent to the Congressional Committee the returns from said primary election held in Leon County, a copy of the protest filed by Kehoe, and the committee's ruling thereon dismissing said protest upon the grounds that said protest was vague, indefinite and uncertain, and failed to specify the particular grounds of the alleged illegality of said votes, and also transmitted to the Congressional Committee a certificate from the Supervisor of Registration of said county of Leon that the registration books of said county showed that in precinct No. 5 there were only ten registered voters who had paid their poll taxes for 1907, in precinct No. 8 only nineteen registered voters, and in precinct No. 16 only sixty-one registered voters, and that such list included those who were

over age and under age, and otherwise not liable for a poll tax.

Twelfth: That the County Executive Committee of Madison County forwarded to the Congressional Executive Committee the returns from the primary election held in said county, and certified that J. Walter Kehoe received in said county 333 votes and D. H. Mays received 715 votes; that the said committee further certified that the following irregularities were noted under protest of J. Walter Kehoe, a copy of which protest was inclosed with the returns, to-wit: Precinct No. 3, three voters sworn and voted, names not appearing on the registration list; also nine challenges cause not noted by managers, the voters challenged were permitted to vote. Precinct No. 5, four voters were sworn and voted, names not appearing on the registration list. Precinct No. 6, four voters were sworn and voted, names not appearing on registration list. Precinct No. 8, two voters sworn and voted, names not appearing on registration list, which said returns were signed by M. L. Leslie, Chairman, and W. N. Davis, Secretary of the Democratic Executive Committee for Madison county. That the protest of J. Walter Kehoe against the counting of the ballots in precincts Nos. 3 and 5 alleges that the ballots were secured on the day of the election before the closing of the polls and were used on the outside of the polling booth during that day by the electors, and also that persons were allowed to vote who were sworn in at the polls on the day of the election who had not been previously sworn in as a qualification for an elector and who were not otherwise qualified to vote at said election; that there were attached to the returns from Madison county a letter from Hon. J. Walter Kehoe dated June 18th, 1908, addressed to the Executive Committee of Madison county in which said Kehoe stated that he was informed of certain violations

of the primary law in the election on June 16th, 1908, and that he desired to file a general protest against canvassing the vote of that county, and every precinct thereof for Congressman, and asked to be given reasonable time to submit proof before the committee of said irregularities and to be advised as to when he could submit it; that he could be reached by wire at Marianna, and that in the event that the committee did not grant his request, he asked that the committee canvass the ballots and not simply the tally sheets and certificate of the managers, and that if his protest and request for time were not granted that they would attach his protest and request to the returns to the Congressional Committee. A copy of the returns as made up, compiled and certified by the Executive Committee of Madison county together with the letter and protest of said J. Walter Kehoe are attached to the alternative writ marked Exhibit "B" and made a part thereof.

Thirteenth: This ground of the alternative writ alleges that the protest seeking to invalidate the returns from precincts Nos. 5, 8 and 16 of Leon county, and the returns from precinct No. 3 in Madison county, only make a total of forty-two illegal votes, not sufficient to change the result of the primary election.

Fourteenth: In this ground of the alternative writ it is alleged that the alleged illegal votes from Leon county should all be canvassed and counted because neither Kehoe nor any one in his behalf challenged the said illegal voters before the inspectors of election at said precincts, nor were any of the objections to said votes raised by Kehoe in his protest to the count of said votes presented to the inspectors at said precincts, and further it is alleged that in the protest filed by Kehoe before the Congressional Committee for said District no objection

was made to the counting or canvassing the returns from precincts Nos. 5, 6 and 8 of Madison count--

Fifteenth: This ground of the alternative writ alleges that Kehoe introduced no evidence in support of his protest before the committee as to the alleged illegalities in the votes in Leon and Madison counties, nor that said alleged disqualified voters voted for D. H. Mays, but that notwithstanding the Congressional Committee continued its deliberations until Saturday night, July 18th, 1908, and failed and refused to canvass the returns from said Leon and Madison counties, and adjourned to meet in Tallahassee on the 27th of July, 1908, and that the Chairman of said committee failed and refused to cause the name of relator to be certified to the county committees as the successful candidate to be presented to the voters at the general election, and that said Congressional Committee and the chairman thereof still refuse to canvass the said returns from Leon and Madison counties and continue to withhold from relator the certificate of his nomination.

Sixteenth: This ground of the alternative writ alleges that these failures and omissions on the part of the said Democratic Executive Congressional Committee, and the chairman thereof, and each and every member thereof to perform and discharge their duties and obligations to relator have resulted in great confusion, inconvenience and injury to the relator.

Seventeenth: Relator alleges he is without remedy except through the writ of mandamus. The prayer of the writ as amended is as follows: Wherefore the relator prays that a writ of mandamus may be issued by the Honorable Court directed to the said A. H. D'Alemberte, J. F. Poore, George Ward, J. R. Wells, J. M. Miller, and J. Neal as proxy for J. M. Miller, Milton Pledger, Tom Shuler and J. F. Shuler as proxy for Tom Shuler, A. J.

Alford, M. Bates, C. D. Clark, J. W. Henderson, S. M. Bolton, E. B. Bailey and Black Ashley, composing the Democratic Congressional or standing committee for the Third Congressional District of Florida to forthwith canvass the returns of the primary election held in said District on June 16th, 1908, in the several counties composing the Third Congressional District of the State of Florida as said returns were made up, compiled and certified to said committee by the several County Democratic Executive Committees in the said counties composing said Third Congressional District of Florida, and to ignore and disregard the protest or petition of the said J. Walter Kehoe filed by him with the chairman of the said Congressional or Standing Committee, and determine and declare in writing the name of the successful candidate for the office of Member of the House of Representatives of the Third Congressional District of Florida of the Congress of the United States who appears from the face of the returns from said primary election held on June 16th, 1908, as the same were made up, compiled and certified by the County Democratic Executive Committees of the counties composing said Third Congressional District of the State of Florida, to have been chosen by a majority vote of the electors in said primary election, and that such other and further order may be made in the premises as to your Honor shall seem meet and justice may require, &c., and in duty bound your petitioner will ever pray. The alternative writ was amended by leave of court dismissing the cause as to J. Neal as proxy for J. M. Miller, and J. F. Shuler as proxy for Tom Shuler.

Attached to the alternative writ and marked Exhibit "A" is the protest filed by J. Walter Kehoe with the Democratic Congressional Committee made a part of the alternative writ, the material points of which are set out in said writ, and the specific precincts named therein as

those in which persons were allowed to vote who had not paid their poll tax are precincts numbered 5, 8 and 16 in Leon county, and precinct numbered 3 in Madison county. This protest concludes with a prayer that the returns from these precincts be rejected in the canvass.

In the protests filed by Mr. Kehoe with the County Executive Committees of Leon and Madison counties, it is not charged that the alleged illegal votes "were cast, received and canvassed by and with the connivance, knowledge and consent of the inspectors and said illegal voters with a common design to disregard the law and ignore the provisions of the statute requiring a poll tax as a prerequisite to voting," as was done in his protest filed with the Congressional Committee. No point is made that Mr. Kehoe's protests with the county committees were not filed within proper time. They were disregarded by the county committees.

A motion was made by the plaintiffs in error to quash the alternative writ, containing twenty-one grounds, among them that the court was without jurisdiction or authority to issue the writ; that the court could not control their discretion in the performance of their duty; that the court could not require them to ignore a protest lawfully filed, and that it does not appear from the writ the respondents were either clothed with or in the exercise of such public or sovereign powers and functions as to authorize either the State Attorney or Attorney General to control their action by mandamus upon the relation of D. H. Mays or otherwise. This motion was overruled, the respondents excepted to this ruling, and were allowed twenty days to present their return.

On the 27th of August, 1908, the respondents (plaintiffs in error except J. M. Miller) filed pleas in abatement to the effect that they were each severally residents of the several counties composing the Third Congressional

District; that none of the members of said committee were residents of Leon county except J. W. Henderson; that the cause of action did not accrue in Leon county, and that no affidavit was filed by relator that the action was brought in good faith and without any intention of annoying the respondents, and that they claim a privilege of being sued, if at all, in their several respective counties.

J. M. Miller filed a plea in abatement to the effect that he had been elected and had qualified as executive committeeman of Holmes county, he had not attended any of the meetings of the executive committee, had not acted in this case, but had been represented by proxy, and knew nothing of his own knowledge of what had transpired in the case. A similar plea was filed by Tom Shuler.

These pleas in abatement filed by plaintiffs in error were overruled and they were required to file further returns instanter  J. M. Miller does not appear to have filed a further return, but the other plaintiffs in error did. Their return with the exhibits attached to it covers a great many pages of the record, and contains a long detailed statement of what occurred at the various meetings of the committee all held in Leon county when they were considering the canvass of the votes sent up by the county committees. It does not deny what we regard as the material facts set up in the alternative writ, *viz*: The facts that a second primary election was held in June, 1908; that the returns sent up by the county committees showed on their face that Mays had received a majority of forty-nine votes over Kehoe. It undertakes to justify its action in refusing to canvass the returns from the three precincts in Leon county, *viz*: 5, 8 and 16, because persons had voted at those precincts whose names did not appear as duly qualified upon the registration books, and to justify its action in regard to precincts 3, 5, 6 and 8 of Madison county. The language they use with reference

to these precincts is as follows:  "That it appeared from the face of the certified returns from Madison county that in precincts 3, 5, 6 and 8 in said Madison county thirteen unregistered and unqualified persons were permitted to vote for Congressman in said primary election of June 16th, 1908, and it was resolved by said committee that nine of said votes so illegally cast in Madison county should be deducted from the total vote of the said Mays and that four of the said votes should be deducted from the total vote accredited the said Kehoe from the said precincts as canvassed and returned by the canvassing board of Madison county, the said deductions being in proportion to the votes purporting to have been cast and received by the said Mays and Kehoe in said precincts."  The return then shows that in canvassing the votes in this way they found and officially announced that Kehoe had a majority of nineteen over Mays of all the votes cast at said primary.  In the prayer of the protest filed by Mr. Kehoe with the Congressional Committee he only prayed that the precincts Nos. 5, 8 and 16 in Leon county and precinct No. 3 in Madison county be rejected in canvassing the returns of the respective counties.  The return from the Executive Committee of Madison County to the Executive Congressional Committee stated in substance that after canvassing the returns of the election held on June 16th, 1908, Kehoe received 335 votes and Mays 715 votes, and that certain irregularities were noted under the protest of Kehoe, *viz*: in precinct No. 3, three voters were sworn and voted, names not appearing on the registration list; in precinct No. 5, four voters were sworn and voted, not appearing on the registration list; in precinct No. 6, four voters were sworn and voted under the same circumstances; in precinct No. 8 two voters were sworn and voted under same circumstances.  As to the alleged illegal voting in Madison county there does

not appear to have been any other evidence before the Congressional Committee than is contained in the above mentioned return by the county committee as irregularities. The return shows that the Congressional Committee met at various and sundry times at Tallahassee between the 8th of July, 1908, and the 27th of July, 1908, to canvass the returns, and gives in great detail what took place at those various meetings. It alleges that on the 27th of July, they canvassed the returns and found a majority for Kehoe of nineteen votes, and that he was given a certificate of election by the chairman some time before 8:30 P. M., to which hour the committee adjourned to enable the minority to make a minority report if they desired to do so; that when they met pursuant to adjournment and after the certificate had been issued as aforesaid, the sheriff of Leon county unceremoniously delivered to D'Alemberte and others of the committee the alternative writ in this case and proceeded to read aloud in the presence of the committee the original writ of mandamus in this case.

The return denies that no evidence was produced by Kehoe of the alleged irregularities in the votes in the precincts in Madison and Leon counties, but that he offered in evidence before the Congressional Committee a certified copy of the registration books of Leon county after the closing of the books in 1908, a copy of which is attached to the return marked "J;" that in addition he produced before the Congressional Committee and caused one D. A. Simmons to be sworn, who testified that he had addressed and mailed immediately prior to said primary election to the clerk and inspectors at each and every precinct in Leon county, including precincts 5, 8 and 16, a letter, a copy of which is attached to the return marked "K," as a part of it. An examination of exhibit "J" shows that it is not, and does not purport to be a certified

copy of the registration books of Leon county, but only a certificate of the supervisor showing the number of voters in each precinct who had paid poll taxes within the time prescribed by law as certified by him to the Tax Collector, and all who are designated on the registration books as entitled to vote by reason of non-age and over-age, and all designated as having no poll tax assessed against them or either of them of the two years last past. No names of registered voters are given, and the certificate is nothing more than a sort of summary made by the Supervisor. Exhibit "K" is a letter by Mr. Simmons, the Private Secretary of the Governor, addressed to Mr. Rhodes, Clerk of the Primary Election District No. 16, Leon county. This letter advises the party to whom addressed in substance that no one should be allowed to vote whose name was not on the copy of the registration book to be sent them by the Supervisor on which could be noted every man entitled to vote by reason of his having paid his poll tax, or by reason of non-age or over-age, and that the precinct officers who did so would violate their oaths and subject themselves to prosecution for perjury, under section 265 of the General Statutes. This letter is dated May 13th, 1908.

On the 27th of August, 1908, the respondents filed an amended return stating therein that since the service of the alternative writ on them the Secretary of State had issued a certificate to J. Walter Kehoe showing he had been nominated for candidate for Congress from the Third Congressional District.

These returns were demurred to by relator on seven grounds, in substance:

First. They fail to deny the material allegations of the writ.

Second. Each sets up irrelevant, immaterial and impertinent matters.

Third. The reasons set up for not canvassing the votes from Leon and Madison counties not sufficient.

Fourth. The committee was without jurisdiction to entertain the protest of Kehoe.

Fifth. The returns show an abuse of the powers given by law to the committee.

Sixth. The returns are evasive.

Seventh. The returns show nothing inconsistent with the rights of relator.

The court sustained this demurrer on the 28th of August, 1908, and ordered a peremptory writ. On the same day, 28th of August, 1908, and previously to the making of the above order the respondent made a motion to quash the alternative writ because, in substance, first, the statute upon which the writ was based is unconstitutional and void in that it prescribes qualifications for voters and electors at primary elections other than those prescribed in the constitution, and is violative thereof in that it delegates to committees calling primary elections the power to prescribe qualifications of voters and electors at said elections in addition to those prescribed in the constitution, and to assess sums of money against and require payment of same by candidates as a prerequisite to become a candidate; second, that the alternative writ as amended is unauthorized by the prayer of the petition and is at variance with same. This motion was overruled and respondents excepted to the ruling.

A peremptory writ of mandamus was issued and served and the respondents made a return in accordance with its mandate showing that Mays was nominated by a majority of forty-nine votes.

Six other members of the Congressional Committee filed returns admitting the allegations of the alternative writ and alleging that they had always been willing to canvass the returns from the county committees accord-

ing· to what appeared on their face, and that they were perfectly willing to obey the peremptory writ. They further alleged that there was no evidence introduced by Kehoe before the committee showing a violation of law by the inspectors or connivance with voters to have illegal votes cast for Mays. We have to give the substance of this long record embracing about 300 pages and if we have failed in any particular under the pressure upon us to reach a conclusion in the interest of the public, we must refer to the exceedingly defective index which accompanies the record. We have practically had to make our own index.

Such other facts as it may be necessary to notice will be referred to in the opinion. A writ of error sued out by the plaintiffs in error brings the orders of the court below here for review.

*Reeves & Watson,* for plaintiff in error.

*Blount & Blount & Carter, Raney & Oven, D. A. Finlayson* and *W. H. Ellis,* for defendant in error.

HOCKER, J., (*after stating the facts*). The assignments of error not specifically abandoned here are in substance the following:

1. The court erred in overruling the motion by D'Alemberte and other movants named to quash the original alternative writ of mandamus herein.

2. The court erred in overruling the motion to quash the· original alternative writ.

4 and 5. The court erred in sustaining the demurrer of relator to the return to the alternative writ filed by Tom Shuler, and to the additional return by Tom Shuler.

7. The court erred in sustaining the demurrer filed by relator to the return by J. M. Miller.

9. The court erred in sustaining the demurrer filed

by relator to the return by respondents D'Alemberte, Ward, Wells, Pledger and Clark.

12. The court erred in overruling the motion filed by D'Alemberte and other movants to quash the amended alternative writ of mandamus.

13. The court erred in awarding the peremptory writ of mandamus.

14. The court erred in designating in his order awarding the peremptory writ Tallahassee as the place of performance of the acts required to be done by the peremptory writ.

Before entering upon the discussion of these assignments, it is necessary to refer to the statutes of this State relating to primary elections. By section 255 General Statutes of 1906, the State Executive or Standing Committee of any political party in this State, or any Congressional District, or County, is authorized to decide to hold primary elections, and to give notice of such elections.

Section 256 *Id.* provides that such notice shall state the day of such election, the hours within which it is to be held, the names of the inspectors appointed to hold such election and receive the votes cast, and make report and return thereof, and the time when such return and report shall be made to the committee directing such meeting to be held.

Section 257 provides for registration for such primary elections.

Section 258 provides that no person can vote or take part in the proceedings of any primary election who is not by the laws of this State a lawful elector, who has not paid his poll tax legally due not less than ten days before such primary election is held and authorized to vote in any legal election in the ward or precinct for which such primary election is held.

Section 259 provides that the Executive or Standing Committee calling such primary election may declare the terms and conditions on which legal electors offering to vote at such election shall be regarded and taken as proper members of the party at whose instance, or in whose interest such primary election has been called, or may be held, &c.

Section 260 provides that "Any recognized member of the party in whose interest such election is held may challenge the right of any person offering to vote at such election, and the inspectors authorized to hold and holding such election shall determine on the evidence *then* furnished whether the person so offering is entitled to vote at such election, and shall receive or reject such votes so offered as the evidence for or against the right of the persons so offering to vote shall reasonably warrant.

Section 261 provides that "The inspectors holding such primary election under the provisions of this Article may of their own motion, or in any case of the challenge of any person offering to vote, if they deem there is any doubt of the propriety, under the provisions of this Chapter, of the vote so offered require of the person so offering to vote his oath to the fact which authorized the vote, and if the person so offering to vote declines to make oath so demanded his vote shall be rejected."

Section 262 provides for votes by ballot at primary elections.

Section 263 provides that "The report to the committee so directing such primary elections by the officers holding the same shall be in writing, with which the original ballots shall be returned, and the poll list of the voters made at the time of the voting, and the reasons on which any challenged vote was received or rejected. Said committee shall carefully examine the returns and reports

so made, and thereupon decide who have been chosen by the majority vote cast in the primary election for delegates to the convention, and from what ward or precinct, if the meeting were for the appointment of delegates to such convention, or what person or persons by a majority vote have been elected as candidates of the party, as the case may be, for the office or offices to be filled at the approaching election."

Section 264 provides for a second primary election where no person shall have received a majority of all votes cast for the several candidates.

Section 265 provides that the inspectors who held a primary election shall before assuming the duties make oath that they will honestly, faithfully and to the best of their ability do and perform the duties of their respective offices; and any wilful violation of said oath, or of any other oath taken under the provisions of this Article shall be held to be perjury, and punished as perjury.

Section 268 provides for assessing the candidates for raising money to pay the expenses of a primary election.

Section 270 provides that except as provided all elections under this Article (primary) shall be regulated by the election law of the State as nearly as the same can be done.

Chapter 5613, Laws of 1907, deals with primary elections. Section 2 of said act provides that the Congressional Executive Committee of a political party shall consist of one member from each county in the District who shall be elected for two years, etc.

Section 4 of said act provides that the County Executive Committees shall be not more than one member from each precinct in the county who shall be elected, etc. It also provides that before any person shall enter upon the duties of Executive Committeeman—County, State or Congressional—he shall subscribe an oath or affirmation

that he will perform the duties of committeeman in accordance with the duties of the primary law and act impartially as to candidates in the enforcement of the same, said oath to be filed with the Clerk of the Circuit Court.

Section 5 of said act provides that Executive Committees shall not recognize the proxy of any member unless such proxy is held and represented in person by a resident of the same county or precinct where the committeeman giving it resides.

Section 7 provides that the decisions and rulings of County and Senatorial Committees for a county office and members of the House and Senate shall be final.

Section 8 of said act is as follows: "That if any candidate for United States Senator, or any candidate for any State or Congressional office is dissatisfied with the rulings or decision of the County or Congressional Committee affecting his candidacy in said county, said candidate shall file within twenty days after the result is declared with the State or Congressional Executive or Standing Committee, as the case may be, his protest as to the result of the election in such county; whereupon the chairman of the State or Congressional Executive or Standing Committee shall, after filing such protest, cause notice of such protest to be given to the County Executive or Standing Committee wherein the irregularities are alleged to exist, whereupon it shall be the duty of such County Committee to immediately forward a certified copy of all such evidence submitted to and considered by them and their rulings and decisions thereon to the State or Congressional Committee, as the case may be, and such committee shall *review* the findings and decisions of the County Committee and its decision thereon shall be final."

The first and probably the most important question presented here is the jurisdiction and authority of the

courts to entertain mandamus proceedings in a case like
the present.    It is strenuously insisted by the plaintiffs in
error that our courts have no jurisdiction over questions
arising under the primary election laws; that they belong
to the domain of political questions, with which the judi-
cial department of the State government under the con-
stitution and laws has nothing to do.    To sustain this
contention Ramey v. Woodward and State *ex rel.*  Bar-
bee v. Brown, both being Mississippi cases and found on
page 769 of the 44th Southern Reporter, are cited and
relied on.    The first of these cases was decided to be a
contest between rival candidates under the primary law,
and it was held the courts could not entertain such a con-
test.    The second was a mandamus case to compel a com-
mittee to reassemble and canvass the result of a primary
in accordance with the true returns.    It was held the
courts of Mississippi had no power to entertain contests
between candidates at primary elections.    It is apparent
that this court regarded the case before them as a contest
between rival candidates and not simply as a proceeding
to compel officers or quasi-officers to perform a statutory
duty.    A large number of other cases from other States
including Louisiana, Kentucky, Colorado, Missouri,
Michigan, Rhode Island, New Hampshire, &c., have been
cited to us in the briefs of the plaintiffs in error and to
some extent some of them may be said to sustain the con-
tention that courts have no jurisdiction of purely politi-
cal questions, especially such as arise under primary elec-
tion laws.    But in most of these cases the courts have
treated the cases as election contests.    Again, in some
of the States there are constitutional provisions author-
izing the legislature to designate the courts which shall
try election contests.    For instance the Constitution of
Colorado, Article VII, Section 12, is as follows:  "The
General Assembly shall by general law designate the

courts and judges by whom the several classes of election contests not herein provided for shall be tried, and regulate the manner of trial and all matters incident thereto." In section 148, Article 3 of the Constitution of Kansas it is provided that the judicial power is vested in a Supreme Court, District Courts, Probate Courts, Justices of the Peace, and such other courts, inferior to the Supreme Court, as may be provided by law.

Stimson in his work on Federal and State Constitutions of the United States, section 238, cites a large number of States in which the constitutions have special provisions with reference to the trial of contested election cases. Exactly what effect these constitutional provisions have had, if any, in determining the views of the courts in those States upon the question of their authority to take jurisdiction of election controversies we are not able to say. Certain it is, however, that many of them refuse to entertain such a jurisdiction. It is impossible to review these decisions in this opinion within any reasonable length of discussion though they have each been examined. Other courts do not take this view of the power of the courts to use the writ of mandamus to compel a proper canvass of the returns in primary elections. See Bradley v. Board, Mich. , 117 N. W. Rep. 649.

In the case of Freeman v. Board of Registry and Election of Metuchen, 67 Atlantic Reporter 713, the Supreme Court of New Jersey held that mandamus will lie to compel a Board of Registry and Election to make up and sign such a statement of the result of a primary election as was required by law. In the case of State *ex rel.* Guion v. Miles, 109 S. W. Rep. 595, the Supreme Court of Missouri in discussing the primary election law of that State, and the rights of a committeeman who had been elected under it, and who had been improperly re-

moved, held that where the duties imposed by law on a person either make him a public officer or a quasi-public officer, or where the position is one wherein he has the right to perform the duties and functions required of him, and the matter about which he performs the service is one of public concern, or where the position is one with such characteristics as to make it analogous to that of a public office, mandamus lies to restore him to the rights of which he has been illegally deprived by being removed from his position.   The court further says that mandamus is a prerogative writ of a remedial nature and it is issued in all cases where the party has a right to have anything done and has no other specific means of compelling performance.   This case holds that those who constitute the governing authority of a political party acting under a primary election law are analogous to those of a public officer; that he is elected to fill public duties of great public concern; that his duties are regulated by statute and that the law gives him a definite legal standing and legal rights which he may enforce.   The court quotes from Mason v. Byrley, 26 Ky. Law Rep. 487, 84 S. W. Rep. 767, and State *ex rel.* Rinder v. Goff, 129 Wis. 668, 109 N. W. Rep. 628, 9 L. R. A.  (N. S.) 916.  In the last case the doctrine was applied to a man who had received the plurality of the votes of his party at a primary election.   The Missouri court also rely upon and quote largely from the decision of the Court of Appeals of New York, in the case of People *ex rel.* Coffey v. Democratic General Committee, 164 N. Y. 335, 58 N. E. Rep. 124.   In this case the opinion of the majority of the court delivered by Judge PARKER goes extensively into the history of primary election laws, and of the abuses that led to their adoption.   It is unnecessary to state them at length in this opinion as we feel sure they are well known to the profession and the people.   In this case the writ of man-

VOL. 56, JUNE TERM, 1908.          191

D'Alemberte, et al. v. State *ex rel.* Mays.—Opinion of Court.

damus was used under very much the same circumstances as in the Missouri case. In the case of People *ex rel.* Breckton v. Board of Election Commissioners of Chicago, 221, Ill. 9, 77 N. E. Rep. 321, the writ of mandamus was used to compel the commissioners to allow the Socialist party to hold a primary election under the act of May 11th, 1901. In this case they also decided the primary law to be constitutional in its main features.

We think it is admitted in the briefs of the plaintiffs in error that the weight of authority now is to the effect that State Legislatures have the general power to pass reasonable primary election laws. 5 Am. & Eng. Anno. Cases, p. 568 and note. But it is contended inasmuch as the record shows that the Congressional Committee had already issued a certificate to Mr. Kehoe before the writ was served upon them, that this case involves an election contest between Mr. Kehoe and Mr. Mays, and that in such a case mandamus does not lie. The same question was presented by respondents in the celebrated case of Drew v. State Canvassing Board, 16 Fla. 17, but the court held in effect that there had been no canvass until all the votes cast had been canvassed. State *ex rel.* Bisbee v. Board of State Canvassers, 17 Fla. 29, text 64 (head-note 8) ; State *ex rel.* Bloxham v. Gibbs, 13 Fla. 55, S. C. 7 Am. Rep. 233.

Our opinion upon the point under discussion is that the rights created under our primary law are such that when violated the courts may be resorted to for their redress, and that the writ of mandamus may be used to compel the performance of the duties which are imposed by the statute upon the members of the Congressional or Standing Committee of a Congressional District, if those duties are ministerial and not judicial. Section 35, Article 5 of our constitution as amended in 1898, reads as follows: "No courts other than here-

in specified shall be established in this State, except the legislature may clothe any railroad commission with judicial powers in all matters connected with the functions of their office." As there is no provision of the constitution authorizing the legislature to confer judicial powers upon those who hold, conduct or canvass elections, primary or otherwise, the powers conferred must necessarily be ministerial in their nature. Drew v. State Canvassing Board, *supra;* State *ex rel.* Bisbee v. Board of State Canvassers, *supra.* It is clear from these cases that a canvassing board can have no exclusive and ultimate power to pass upon the question whether a vote cast at an election was legally cast, for that is a judicial question. We must, therefore, construe the primary election laws in the light of these decisions.

It is contended by plaintiffs in error that this view would necessarily result in our holding the primary election law to be unconstitutional, because according to the contention judicial powers, the power to pass upon the legality of votes cast at an election, and the making of the decisions of the County and Congressional Committees final upon these and other questions would bring the whole law in conflict with the constitution, as it cannot be concluded the legislature would have passed the primary statutes without these provisions. It is our duty to hold the statutes to be constitutional if we can do so without violating the plain intent of the legislature.

We think it plain that section 260 General Statutes *supra,* provides the only occasion when and method by which the right of a person to vote at a primary election can be questioned. It is to be done at the time such person offers to vote. The inspectors *then* hear the evidence and *then* determine for or against the right of persons offering to vote, as the evidence shall reasonably warrant. This is a necessary minitserial or quasi-judi-

VOL. 56, JUNE TERM, 1908.          193

D'Alemberte, et al. v. State *ex rel.* Mays.—Opinion of Court.

cial power, without which no orderly election could be held.

Section 261 General Statutes, *supra,* provides for the challenge of a proffered vote by the inspectors or others. Section 263 provides that the report by the officers holding the election to the committee shall be in writing accompanied by the original ballots and poll list, and the reasons on which any challenged vote was received or rejected. This provision is intended, we think, to preserve the evidence of what occurred at the polling places. The section then provides that the committee shall carefully examine the returns and reports so made, and thereupon decide who has been nominated. We do not think that this section authorizes the committee to seek or take any evidence outside of the returns and reports so far *as the legality of any vote is concerned,* for there is no authority given them to summon witnesses or go into an investigation of such a question. It may be contended there is an implied authority under section 8 of Chapter 5613 to go into an investigation of irregularities generally, inasmuch as that section requires the County Committees to forward to the Congressional Committee, where a protest is filed by a Congressional candidate "a certified copy of all such evidence submitted to and considered by them." We think this means a certified copy of such evidence as inspectors are authorized to take upon the challenge of a vote, and which inspectors are required to send to the County Committee. It is also our opinion that said section 8 confers no power upon the Congressional Committee of taking testimony or of going outside of the returns made to it by the County Committee. There is no express power given, and an implied power is negatived by the fact that they are only authorized to *review the findings and decisions of the County Committee.* We are furthermore of opinion that it is unneces-

sary to construe the word *final* in Sections 7 and 8 of said act, in which it is said that the *decisions* and *rulings* of the County, Senatorial, Congressional and State Committees shall be final, as giving to the said committees, absolute and final authority in the matters upon which they decide. The word may very well be understood as meaning that when a matter has been decided by a committee, that decision is to be final as to the committee; that there is to be no procrastination and delays such as are incident to re-hearings and re-considerations. It seems to us that such a view is essential to the proper and expeditious operation of the primary law, for if a primary election is called at a sufficiently early date, as it should be, and the committeemen and officers are prompt in attending to their duties and in making their decisions, it seems to us that there would be ample time left between the dates of those decisions and the date of the regular election for any candidate dissatisfied with the final rulings against him to promptly contest with his successful opponent by *quo warranto* or other proper proceeding, if there be any, the legal right to the nomination. We think the primary law imposes upon inspectors and committeemen very important public functions in the proper and prompt discharge of which the public has an interest, and that these duties cannot be intentionally and unnecessarily shirked or avoided without incurring liability. Thus construed we think the primary law is constitutional, and that its ultimate connection with the right of suffrage under the constitution makes it just and proper that the rulings of our court, in regard to the powers and duties of Canvassing Boards under the general election law should as far as appropriate be applicable to the construction of the primary laws. We therefore do not think the Circuit Judge erred in overruling the motion to quash the alternative writ, or the

amended alternative writ, or in sustaining the demurrer to the returns of the plaintiffs in error, or in awarding the peremptory mandamus. · So far as the return of J. M. Miller is concerned, and the ruling of the court thereon, it is sufficient to say that Miller having been elected and having qualified as a committeeman, could not avoid responsibility by voluntarily appointing a proxy, or proxies simply to avoid some trouble and expense. The statute does not require him to appoint a proxy. It simply permits one to be appointed, and when one is appointed he is simply the representative of his principal for the time being. It is still the duty of the principal to discharge his legal functions when the votes cast at a primary have not been canvassed as we think is shown in this case under the light of our decisions.

In this case the record shows that the Congressional Committee was having its official meetings in Leon County, one of the counties of the Congressional District, that the acts and omissions of the committee complained of took place and occurred in Leon county, and that the members of the committee were in Leon county engaged in their public duties as such committeemen when served. 'Under these circumstances it cannot be said there is error in requiring the committee to properly perform their public duties in Leon county.

We think we have discussed all the questions which are properly before us under the assignments of error.

The judgment of the Circuit Court awarding a peremptory writ of mandamus is affirmed.

TAYLOR, COCKRELL and WHITFIELD, JJ., concur.

PARKHILL, J., disqualified, took no part in the consideration of this case.

The Chief Justice read and approved the opinion but was prevented by illness from being present at its announcement.