NATHAN MAYO, Commissioner of Agriculture, et al., v. FLORIDA GRAPEFRUIT GROWERS PROTECTIVE ASSN., et al.

151 So. 25

Opinion Filed October 2, 1933.

Rehearing Denied October 23, 1933.

_Cary D. Landis,_ Attorney General, _H. E. Carter_ and _Robert J. Pleus,_ Assistant Attorney General, and _Zewadski & Pierce, Milam, McIlvaine & Milam,_ and _Grimes & Rowe,_ for Appellants;

_Bryant & Trantham, H. M. Hampton, James Whitchurst_ and _C. E. Ware,_ for Appellees.

ORDER.

Upon consideration of the application of appellants for an order superseding the injunction order herein, it is considered ordered and decreed that the application for supersedeas be continued until September 12th, 1933.

And it is further ordered that the decree appealed from be stayed insofar as it applies to the packing or shipping or attempt to ship the fruit involved herein and insofar as it interferes with the statutory inspection activities of the appellants.

It is so ordered.

DAVIS, C. J., and WHITFIELD and BUFORD, J. J., concur.

ORDER.

This cause having been duly submitted on oral arguments and briefs of the parties upon the merits of the appeal, and

upon the application of appellants for an order superseding the injunction order appealed from, and it appearing that an order has been heretofore entered in this cause ordering that the decree appealed from be stayed insofar as it applied to the packing or shipping or attempt to ship citrus fruit involved herein and insofar as it interferes with the inspection activities of the appellants herein, which order expires September 12th, 1933, it is now ordered that said stay order entered the 21st day of August, 1933, herein be continued herein until further order of this Court in the premises.

Ordered accordingly.

### . STATEMENT.

Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, provides that it shall be a criminal offense for any person, partnership, association or corporation owning, managing, or tending and cultivating citrus groves or trees, to use arsenic, or any of its derivatives, or any combination, compound or preparation containing arsenic, as a fertilizer or spray, on bearing citrus trees, except when so ordered by the Federal Government, or State Plant Board, for the purpose of destroying the Mediterranean Fruit Fly. This Section, as a valid criminal statute, has been held constitutional by this Court. See L. Maxcy, Inc., v. Mayo, 103 Fla. 552, 139 Sou. Rep. 121; Ex parte Kilgore, 106 Fla. 723, 143 Sou. Rep. 610.

Section 2 of the Act above referred to, provides that it shall be unlawful for any person, partnership, association or corporation to sell, or offer for sale, transport, prepare, secure or deliver for transportation or market, any citrus fruit of any variety, which shall "contain" any arsenic, or any compound or derivative of arsenic, provided it does not

come from within a quarantined area or is not fruit which has been within a quarantined area for one year previous to time of the gathering of such fruit.

Section 4 of the same Act provides for a method of examination and seizure of any citrus fruit which, upon inspection and test pursuant to Chapter 10103, Acts of 1925 (now superseded by an Act passed in 1931) shows an abnormal and "excessively" high ratio of total soluble solids of the juice thereof, to the anhydrous citrus acid thereof, indicating the presence of arsenic therein, while Section 5 provides for the official drawing of samples from the seized fruit for the purpose of making a chemical analysis of such samples to demonstrate whether or not the juice of the seized citrus fruit contains arsenic as suspected.

Section 6 of the Act provides that all citrus fruit "prepared" for sale or transportation, or which has been, or is being, delivered for sale or transportation, that may be shown by chemical analysis to contain *arsenic,* or any compound or derivative thereof, shall be destroyed by the inspector making the seizure, or by the sheriff of the county where found, provided that the fruit shall be from an area otherwise than such as may have been quarantined during one year from the time of gathering the fruit.

Chapter 10103, Acts of 1925, which is referred to by Chapter number, in Section 4 of Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, was an Act in *pari materis* with said Chapter 11844, as amended by said Chapter 14485. The Act of 1925 prohibited the sale or transportation of citrus fruit that was immature or otherwise unfit for consumption. It effectuated this purpose by providing for the enforcement of such prohibition through the setting up in the Act of citrus fruit maturity tests based upon the total soluble solids of the juice of the fruit, con-

sidered in relation to a specified ratio of total soluble solids of the juice thereof to the anhydrous citric acid found therein.

Chapter 14662, Acts of 1931, was a complete revision and re-enactment of all the regulations intended to be effected by Chapter 10103, Acts of 1925. The enactment of said Chapter 14662, Acts of 1931, being a complete revision and re-enactment of the entire subject matter dealt with by Chapter 10103, Acts of 1925, accordingly repealed the last-mentioned statute, Chapter 10103, Acts of 1925.

Therefore the statute law relating to the required maturity tests for citrus fruits, the inspection and enforcement thereof, and prohibiting the use of arsenic, in connection with the production and marketing of such citrus fruits, was, on the date of the institution of the litigation involved in this appeal, such only as may be found in Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, standing *in pari materia* with Chapter 14662, Acts of 1931.

The appeal herein is from an interlocutory order of the Circuit Court of Polk County, Florida, holding Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, unconstitutional and unenforceable as applied to that particular kind of citrus fruit known and designated as "grape-fruit." By the order appealed from, the enforcement of Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, was enjoined in its entirety insofar as its enforcement against grapefruit was concerned.

The present consideration of this case is upon an application by appellants for a supersedeas of the order of the Circuit Court of Polk County. In connection with the hearing upon this application for supersedeas, the case has been also duly argued and submitted by the parties hereto for determination of the merits of the appeal.

### JUDGMENT ON APPEAL.

PER CURIAM.—This cause having been argued and submitted for the consideration of the Court on the transcript of the record and the briefs filed, and it appearing that in this cause Mr. Chief Justice DAVIS, Mr. Justice WHITFIELD and Mr. Justice TERRELL are of the opinion that the decree appealed from should be reversed, with directions to dismiss the bill, for the reasons stated in an opinion concurred in by them this day filed, and it further appearing that Mr. Justice ELLIS, Mr. Justice BROWN and Mr. Justice BUFORD are of the opinion that the decree appealed from should be affirmed, for the reasons stated in the several opinions, prepared by or concurred in by them, this day filed, and it appearing that the order appealed from is an interlocutory order, granting an injunction until the final hearing of the cause in the court below, and not a final decree amounting to a conclusive adjudication of the pending suit in the court below, it is thereupon considered, ordered and adjudged by this Court that an order be now entered in this cause forthwith vacating the partial order of supersedeas heretofore granted herein, and that the order appealed from, insofar as it grants a temporary injunction, but only insofar as it grants an injunction, temporary in character, be affirmed, but without prejudice to reconsideration of the question of the constitutionality of the statute or of its application, as brought in controversy on this appeal, which question of the constitutionality of the statute and of its application, as applied to this case, is not at this time finally adjudged or decided on this appeal.

Let this order be entered and the mandate of this Court be issued in due course, accordingly.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL, BROWN and BUFORD, J. J., concur.

DAVIS, C. J.—In recently decided cases this Court has definitely held that Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, is a valid exercise of legislative power. L. Maxcy, Inc., v. Mayo, 103 Fla. 552, 139 Southern Reporter 121; *Ex Parte* Kilgore, 106 Fla. 723, 143 Sou. Rep. 610. The same conclusion has likewise been reached in a late case decided by the Federal Courts. Kilgore v. Mayo, 54 Fed. (2d) 143.

That a police regulation, valid when made, may become, by reason of changed conditions affecting the subject of it, so arbitrary and confiscatory in operation or application, as to be capable of being subsequently struck down by judicial action, though previously judicially reviewed and then held to be valid, is to be conceded. See Abie State Bank v. Bryan, 282 U. S. 765, 51 Sup. Ct. Rep. 252, 75 L. Ed. 690.

But in the case at bar, there is no showing in the record now before us, sufficient to bring the present attacks on the statute so recently held valid by this Court, as above indicated, within the rule of Abie State Bank v. Bryan, *supra*. This is so, because conditions affecting the *subject* upon which the statute was intended to operate, have not in any material aspect whatsoever changed in the interim of less than two years that has followed our previous decision holding the statute valid. And while it cannot be denied that the record now brought before the Court does show that much more is today known concerning the policy and wisdom of the statute as applied to grapefruit than was heretofore understood on that subject, such better understanding is not a "changed condition" such as was referred to in the Abie State Bank case, *supra*.

The injunction that has been granted in this case completely wipes the anti-arsenic-spray statute off the books insofar as grapefruit is concerned. By it the Commissioner

of Agriculture is not only restrained from seizing and confiscating any grapefruit which, upon chemical analysis, he finds to "contain" arsenic, but the Commissioner and his inspectors are further restrained from either enforcing or attempting to enforce "any" of the provisions of the Arsenical Spray Law (Chapter 11844, Acts of 1927 as amended by Chapter 14485, Acts of 1929) against the complainants, as to any grapefruit grown by them during the year 1933, now upon their groves. This precludes the right to inspect as well as the right to seize.

The injunction therefore forbids defendants to institute any criminal prosecution under Section 1 of the Act; permits shipments of grapefruit in contravention of Section 2 of the Act, although it may in fact be found to "contain" any quantity of arsenic; prohibits the Commissioner of Agriculture from inspecting any citrus fruit at any packing house or elsewhere, as authorized by Section 3; and in contemplation of law completely writes out of the statutory law any application of any provision of the Act to grapefruit, regardless of whether the grapefruit in question contains arsenic, or not.

It is a well settled canon of constitutional law that before a comprehensive legislative Act can be struck down by the judiciary as being an arbitrary violation of personal or property rights guaranteed by the Constitution, it must be first construed, if possible, in such fashion that its validity can be saved by giving the statute such construction as will make it conform to the organic law. D'Alemberte v. State, 56 Fla. 162, 47 Sou. Rep. 489; Jacksonville v. Bowden, 67 Fla. 181, 64 Sou. Rep. 769, Ann. Cases 1915-D 99; Anderson v. Ocala, 67 Fla. 204, 64 Sou. Rep. 775, 52 L. R. A. (N. S.) 287.

It is also a well settled rule that the courts must uphold

a statute unless it clearly appears beyond a reasonable doubt that it is unconstitutional. Stewart v. DeLand, etc., Road & Bridge District, 71 Fla. 158, 71 Sou. Rep. 42.

Another rule is that a statute is not presumed to contemplate an unreasonable exercise of the authority conferred on officers by it, particularly when material property and personal rights are involved. Willis v. Special Road District, 73 Fla. 446, 74 Sou. Rep. 495; Getzen v. Sumter County, 89 Fla. 45, 103 Sou. Rep. 104.

There is no doubt, as a matter of constitutional law, that a police regulation in the form of a statute, may be inquired into by the courts, even to the extent of their taking testimony for the purpose of demonstrating its wholly arbitrary and unreasonable character, when the purpose of the inquiry is to have a statute judicially declared unconstitutional in application, though fair and valid on its face. Weaver v. Palmer Bros. Co., 270 U. S. 402, 46 Sup. Ct. 320, 70 L. Ed. 654; L. Maxcy v. Mayo, *supra.*

But it is equally well settled, as a rule of constitutional law, to be observed in the decision of cases of the character last mentioned, that a mere preponderance of the evidence, or of other evidentiary considerations, is not sufficient to warrant the declaration by the courts that a statute, though fair on its face, is unconstitutional in its practical operation, because the rule is, that in order to declare any statute unconstitutional, it must be found so by the courts beyond any and all reasonable doubt. Martin v. Dade Muck Land Co., 95 Fla. 530, 116 Sou. Rep. 449.

In view, therefore, of the obvious importance of this litigation to the State, and because of the property interests of a large number of grapefruit producers who may be hurt by the challenged statute, if it be declared valid, but without first stating the construction which must be placed upon it

in order to remove any doubt on the score that it is unconstitutional, it is advisable that the statute be first judicially construed before the objections to its constitutionality are ruled on by this Court.

The object of the statute, as expressed in its title, is to prohibit under penalty of criminal prosecution, as well as forfeiture of the adulterated citrus fruit, the sale or transportation of citrus fruit found to "contain" arsenic.

But since arsenic is one of the common elements of the earth, such as is hydrogen, gold, iron, silver and the like, and is therefore likely to be found in more or less tangible form in the natural state of all fruits and other articles of food, wherein it performs a useful service by supplying what is needed of that element to round out the functions of nature in its ordinary processes, it is obvious that the prohibition of the statute is not directed at citrus fruits which have come to a state of ordinary maturity containing a detectable, but normal, trace of the arsenic element *as it is produced in nature.*

On the contrary, the statute is aimed at the *practice* of producing in the citrus fruit, through artificial means, such as the use of arsenic for spraying, dusting, fertilizing and the like, an unusual and abnormal amount of insidious arsenic, such as is commonly known to science to result from the applied drug, when deliberately employed on the citrus trees to produce chemical reactions in the fruit thereof, that would not otherwise occur in a state of nature.

That *arsenic* is a metallic poison, having lethal propensities when taken into the human system, and that its use on, or in connection with the production of vegetables and fruits for human consumption, is commonly feared as a possible source of poisoning producing injury or death when im-

properly used, is a fact of which this Court takes judicial notice.

This Court must likewise take notice of the fact that the production and sale of citrus fruits, in the growing of which arsenic has been artificially applied for the purpose of bringing about an abnormal change in the natural composition of the edible portion of such fruit, is a practice tending to depreciate not only the quality of the fruit so produced, but is one that has an inevitable tendency toward injuring the fruit's good reputation as being fit and wholesome for the ordinary purposes for which citrus fruits are commonly marketed and sold.

Accordingly an Act of the Legislature enacted for the purpose of suppressing the production and marketing of that kind of citrus fruit whose reputation will be, when offered for sale in the markets, that it is not a naturally grown product of the citrus tree, but is a counterfeited one, the chemical analysis of the edible portion of which discloses the presence therein of a detectable amount of insidiously induced arsenic (a known and commonly feared poison) is well within the police power of the State as an appropriate legislative measure for the protection of the good reputation of the Florida citrus industry in the markets of the nation. It is likewise one that may be sustained as having some reasonable relation to the preservation of the public health, safety and welfare of the consuming public.

To sustain such an Act of the Legislature as a valid police measure, it is not essential that it be supported by a legislative finding that the necessity for the Act arises out of the fact that the inhibited article of commerce will be actually poisonous to the consumer in use.

Such an Act may be predicated upon the common knowledge of the Legislature that without a law against the prac-

tice, some growers will attempt to produce and market a fruit that will subject the whole citrus industry to harmful suspicion that, through the manner of its cultivation, a substantial portion of the output has been made to contain a demonstrable quantity of insidious poison artificially brought about in the edible portion thereof. Thus, on grounds of promoting the general welfare alone, the Legislature may prohibit any harmful practice whose tendency is to engender such fear and distrust in the minds of the buying public that it will likely refuse to purchase at all, any fruit produced in the State where such manner of cultivation is known to be a permissible practice. And when general indulgence in such injurious manner of cultivation is found, its existence will warrant the Legislature in adopting and enforcing, as a means of obviating the harmful effects thereof on the industry, a complete system for inspecting and eliminating at the source of supply, all such fruits as may, upon appropriate chemical analysis, be found to "contain" a demonstrable quantity of an applied poison (such as arsenic) even though the fear of the consuming public may be greatly exaggerated or wholly unfounded as to the injurious consequences of consuming the fruit in question.

And so it is also, that the Legislature must be acknowledged the power under the circumstances just stated, to discourage any practice that tends toward the bringing about of such conditions affecting an industry. This it may lawfully accomplish by entirely forbidding acts which it finds impossible to control by regulation.

So the present statute now being considered must be construed as having for its object (1) the suppression of the *practice* of using arsenic in the cultivation of any kind of citrus fruits, because of the known propensity toward abuse of it when use of arsenic is permitted without supervision,

and (2) the giving of an assurance to the buying public that, by a system of State inspection and elimination at the source of supply, no citrus fruit "containing" insidious arsenic, artificially induced therein in a detectable quantity capable of being demonstrated by chemical analysis, will be allowed to be either sold or transported for sale, to the consuming public. The circumstance that the application of the statute to particular localities may also incidentally have an adverse economic effect on the early marketing of citrus fruit produced in such localities, is a matter for legislative consideration as one of legislative policy, and is not a judicial question for the courts to decide if the statute is otherwise an appropriate and constitutional exercise of the State's police power to regulate the production and marketing of citrus fruits.

Section 1 of Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, was intended to operate as a criminal statute. It is enforceable as such only because it appears to be judicially sustainable by this Court as a reasonable and necessary means of rendering effective the policy of the State to prevent the abuse of *producing* for the market immature and otherwise deficient citrus fruit. By this section is sought to be discountenanced the *practice* of using arsenic in fertilizer and sprays on trees to produce thereby a resultant condition in the citrus fruit thereof that enables it to evade an established test of maturity designed to test the ripeness of the fruit in its normal condition, uninfluenced by the chemical reaction of arsenic applied to the trees for the purpose of creating in the fruit an ostensible state of maturity that the latter does not truly possess.

Section 1 relates to the initiatory marketing procedure involved in the cultivation of the citrus trees for purposes of production of citrus fruit for market, as distinguished

from any possibly discernible effect in the citrus fruit itself. Whenever a violation occurs under Section 1 of the statute, it is complete at the time any arsenic, or its derivatives, is used as a spray or fertilizer on the bearing citrus trees themselves.

The theory on which the validity of Section 1 has been sustained as a valid police regulation is that even though spraying citrus trees with arsenic, or using it as a fertilizer in reasonably small quantities, may in many instances be innocuous in itself, and even beneficial in effect on the trees or fruit when moderately done, nevertheless the impracticability of regulating such use, so as to keep it restrained to a safe degree, has been found to be so great that an absolute prohibition of the practice must be resorted to by the State Legislature as a means of obviating the opportunity for the carrying on of the evil practice of *excessive* arsenation that had been found by the Legislature necessary to be suppressed for the public welfare. The rule is well settled that in such cases altogether innocent practices may be constitutionally prohibited as a means of breaking up a generally recognized evil practice that has been found to be reasonably susceptible of suppression by no other practicable method. L. Maxcy, Inc., v. Mayo, *supra,* and cases cited therein.

But Section 2 of Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, deals with a different situation. Under that Section, the prohibition is not so much against the *practice* of using arsenic on bearing citrus trees (which conceivably may or may not be an evil, depending on the kind of fruit, the degree of use and the duration of the practice) but is to take effect against an ascertainable result, namely, the presence of unnatural arsenic in analytical quantities in the edible portion of the fruit itself, when

such fruit is tested according to the standards and methods of procedure set up by Sections 4, 5 and 6 of the same statute.

Under Section 2 it is unlawful for one to sell, offer for sale, transport, prepare, secure or deliver for transportation or market, any citrus fruit of any variety (which includes grapefruit) that shall "contain" arsenic, or any compound or derivative of arsenic. That the State may lawfully prohibit the disposition of an article intended for human consumption, containing deleterious chemical substances, whether poisonous or not, is amply sustained by authorities. Such action may be taken not only as a permissible health measure, but also as a police measure for preventing frauds, deceptions and impositions from being practiced on the buying public. State v. Layton, 160 Mo. 474, 61 S. W. Rep. 171 (alum in baking powder); Powell v. Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253 (butter and cheese substitutes); Capital City Dairy Co. v. Ohio, 183 U. S. 238, 22 Sup. Ct. 120, 46 L. Ed. 171 (harmless coloring matter in butter and cheese); People v. Price, 257 Ill. 587, 101 N. E. Rep. 196, Price v. People of the State of Illinois, 238 U S. 446, 35 Sup. Ct. 892, 59 L. Ed. 1400 (prohibiting boric acid in food products).

But under Sections 2, 4, 5 and 6, before a seizure and confiscation of alleged arsenated fruit can be lawfully accomplished, the edible portion of the alleged contraband citrus fruit must, upon a chemical analysis thereof made as prescribed in the statutes, be found to "contain" arsenic, or some compound or derivative of arsenic, not normally occurring therein in a state of production where arsenic sprays or fertilizer have not been used. The fact that the trees producing the fruit may be known to have been sprayed or fertilized with arsenic sprays or fertilizers in violation of

Section 1 of the Act, may afford a ground for criminal prosecutions of the offending producers, but *per se* affords no ground for seizing and forbidding the shipment of such fruit, unless the seized fruit itself discloses by chemical analysis that it does, in fact, "contain" arsenic in the sense of that term as used in the law.

The purpose of this portion of the statute is to give the consuming public the assurance, by means of an adequate system for examination and policing of the fruit at the source of supply, that Florida citrus fruits, as actually placed in the channels of trade and commerce, shall not "contain" any arsenic capable of being demonstrated by actual chemical analysis of the edible portion thereof. Such statutory purpose is as fully served if the fruit of sprayed trees is actually made to pass the prescribed arsenic test, as if such trees had never been sprayed at all. This is so because the actual condition of the fruit when offered for transportation and marketing at the point of inspection is what fixes the criterion for applying Section 2. Section 1 is adequately enforceable by ordinary criminal prosecutions of the offending parties.

In Kilgore v. Mayo, 54 Fed. (2nd) 143, the holding of the Federal Court was that due process of law was not denied by the procedure set up for inspection, seizure and destruction of alleged contraband fruit, because of the requirement of the statute that the fruit, after seizure, be held by the Commissioner of Agriculture, or other seizing agency, a sufficient length of time thereafter to permit of *judicial review* of the act of seizure before confiscation ensued. Stated another way, this is in effect an authoritative holding that in every case of actual stoppage or seizure of citrus fruit on the charge that it has been found to "contain" arsenic, the owner is entitled to seek and to have the benefit

of a judicial review of the Commissioner's findings on that score, and to have judicially determined in appropriate proceedings prior to confiscation, whether or not the fruit involved is, or is not, justly subject to condemnation. And on that issue the owner would be permitted by the court trying the case, to offer countervailing evidence of analyses made by his own experts to rebut adverse findings arising from chemical analyses made by agents of the State.

So the constitutionality of the statute is adequately safeguarded by confining the operation and effectiveness of Section 2 thereof, to those cases wherein it is established that the citrus fruit sold, transported, prepared, secured, or delivered for transportation, or market, does "contain any arsenic, or any compound or derivative of arsenic." If it does not, Section 2 of the statute cannot be applied to it. If it does, the owner has no ground for complaint, because, as has been pointed out, the State may constitutionally prohibit fruit containing drugs deemed by the Legislature to be deleterious, from being marketed or sold to the detriment of the reputation of the citrus industry, or in jeopardy of the public health, safety and welfare.

The fact that Section 1 of the statute may have been violated, as has been pointed out, may afford ground for a criminal prosecution. But in and of itself, the mere violation of that section presents no ground *per se* for the seizure and destruction of the resultant fruit, since Section 2, construed in connection with Sections 4, 5, and 6, controls the latter subject.

But this is not to say that the Commissioner of Agriculture, and his agents, may not, when made aware of violations of Section 1, more rigidly inspect and apply at the packing house or other established inspection point, the authorized arsenic tests to fruit picked from unlawfully

sprayed trees. Such tests are provided for as a part of the procedure for enforcing Section 2. Only by so executing the law, can it be made certain that citrus fruit attempted to be marketed or sold, actually contains no arsenic of the character denounced by the statute prohibiting such fruit from being transported and disposed of.

Summed up, Section 2 of the statute, as it should be construed by this Court, undertakes to prohibit the marketing or attempting to market grapefruit, as well as other citrus fruit, which is found to "contain" arsenic to a degree demonstrable by a chemical analysis of the edible portion thereof.

Whether the prescription of such an inhibition results in unfair treatment to certain growers of that fruit, as compared with others more favorably situated as to soil, climate and the like, may give rise to a serious question of legislative policy, but not to a justiciable one. With the wisdom or policy of legislative acts the courts have nothing to do, unless vested rights are plainly impaired, or the equal protection of the law is denied.

It is true that the statute on its face provides that in cases of quarantine, where insect pests must be controlled by the use of arsenic sprays, that such use may be legitimately (and we presume safely) employed. It is also evident that the resultant fruit is permitted to be marketed without any supposed injury to the industry, the public health or the general welfare.

But it is only in cases of quarantine that any such exception is made. And this is no doubt done because of the obvious necessity of the case. It is probably countenanced during a period of quarantine only because of the fact that use of the arsenic during a quarantine period is usually subject to the constant supervision of the State and Federal

authorities who are thereby enabled to prevent and avoid those abuses which the Legislature has found have a tendency to follow where no such vigilant supervision can be maintained.

There is nothing in the record in this case which would warrant the Court in holding the statute, as must be construed by it, not constitutionally applicable to grapefruit as well as to other citrus fruit. The very able opinion of the Chancellor holding to the contrary was probably arrived at upon a less liberal construction of the statute than this opinion has placed upon it. This is a class suit wherein the whole Act has been attacked and held void in its entirety as applied to grapefruit. Any alleged abuses or usurpations under color of the statute are not here involved, although it has been asserted in argument that broader powers are being claimed by the Commissioner of Agriculture than the statute warrants.

If any abuses or usurpations are in due course of procedure by a proper bill in equity charged and sustained, nothing that has been said is to be construed as barring the Chancellor from hereafter considering on such separate bill, and affording to the complainants adequate redress thereon, by injunction or otherwise. Nor is anything herein stated to be construed as a bar to any appropriate relief which may be sought to enjoin upon the officers of the State a proper compliance with the terms of the statute in their course of executing it, by staying within and not exceeding the proper scope of the powers conferred.

WHITFIELD and TERRELL, J. J., concur.

ELLIS, BROWN and BUFORD, J. J., dissent.

ELLIS, J. (dissenting).—In August, 1933, The Florida Grapefruit Growers' Association, a corporation not for profit, organized under the laws of Florida, joined by certain

citizens of Polk, Highlands, Lake, Hardee, Pasco and Pinellas Counties, all owners of citrus groves in their respective counties, exhibited their bill in chancery in the Circuit Court for Polk County against Nathan Mayo, as Commissioner of Agriculture of the State of Florida, and Charles P. Davis, as Chief Fruit Inspector "under the Commissioner of Agriculture."

The purpose of the bill was to secure an injunction against the Commissioner of Agriculture and Mr. Davis, as Chief Fruit Inspector, prohibiting them from attempting to enforce any of the provisions of the "Arsenical Spray Law" (Chapter 11844, Laws 1927, as amended by Chapter 14485, Laws 1929) against the complainants, and against any grapefruit grown by them during the year 1933 and now upon their groves, and against other persons in the same class as complainants. The bill also prayed that the court decree the "arsenical spray law" and its amendment to be void and unenforceable. Attached to the bill as an exhibit there is a copy of a petition addressed to the Legislature of 1933 signed by forty-nine persons including representatives of corporations praying that the above mentioned statutes be repealed or amended so as not to be applicable to grapefruit. That petition shows that the number of boxes of grapefruit estimated for the season of 1932 and 1933 to be handled by the petitioners was more than twenty-eight million.

The defendants moved to dismiss the bill as to all the complainants except the persons named as complainants from Polk County, the grounds being in the substance that the suit is local in character and may be maintained only in the county where the land and crops of grapefruit lie; that the court therefore has no jurisdiction of the "grapefruit" of any complainant alleged in the bill to lie without the

County of Polk and therefore there was a misjoinder of parties complainant.

At the same time the defendants interposed an answer to the bill. The answer denied that the "question involved is of any common or general interest to any persons whatever, constituting a class or otherwise," by which it was probably meant that the enforcement of the statute as to grapefruit and the enforcement of the "rules and regulations" complained of in the bill would in no degree prevent Florida grapefruit from entering into full competition in the markets with such fruit from Texas and other States. The answer also avers that the grapefruit growers in the counties named do not represent 80 per cent of the producers of grapefruit in the State but constitute a "decided but contentious and troublesome minority among the grapefruit growers of Florida." The answer avers that the legislation attacked by the bill has for its purpose the prevention of a "fraud being practiced upon the consumer, whether deleterious to his health or not, which prevention would in turn protect the reputation of the industry as a whole;" this, avers the answer, constitutes the "broader basis" for the statute than the prevention of the shipment of immature fruit which would be deleterious to the health of the consumers.

In paragraph 19 of the answer defendants contend that the application of arsenic in any quantity does not "actually stimulate the maturity of fruit," but its use provides an "artificial means" which "allows the fruit to pass a maturity test;" that Chapter 14485, Laws of 1929, "was purely an emergency measure to meet the crisis confronting the fruit growers of Florida as a result of the Mediterranean Fruit Fly campaign."

In paragraph 23 of the answer the position seems to be

taken that the use of arsenic as a spray renders grapefruit injurious to the consumer and makes it unfit for consumption. It is averred that the consumption in sufficient quantities of grapefruit where the trees have been sprayed with arsenical spray "would cause to the consumer a toxic dose of arsenic" and "that the residual quantity of arsenic found in fruit grown upon trees so sprayed is greater than the tolerance point fixed by the United States Government under the Pure Food Laws." It is averred that the use of arsenic as a spray "renders grapefruit injurious to the consumer and unfit for consumption."

The answer then proceeds to aver what other effects arsenical spray has upon grapefruit as follows: it "interferes with the sugar content, retards the formation of citric acid, reduces the total amount of sugars contained in such fruit, lessens or destroys vitamin 'C' content, reduces in volume the juice content of such fruit and renders the pulp dry and ricy and adversely affects the keeping qualities of such fruit both as to fresh and canned fruit."

It is insisted that it is "utterly impossible to regulate the use of arsenic without an absolute and complete prohibition," and that the Legislature determined by the enactment of the legislation attacked. It is supposed that this averment means that the use of an arsenical spray does not necessarily injure the fruit or produce in it a menace to the health of the consumer, if the use of the spray is guided by a reasonable discretion both as to the arsenical content of the spray and the number of applications made to the trees, but the matter cannot be left to human discretion so the Legislature prohibits the use of arsenic in a spray or in a fertilizer absolutely.

As the answer undertakes by its averments to justify the Legislative wisdom in the enactment of the statute, I notice

the above averment as one which amounts in substance to an admission that the reasonable use of fertilizers and sprays containing a negligible quantity of arsenic would not be injurious to the health of the consumer or deleterious to the fruit as an article of food value, but as in legislative wisdom "mankind is unco weak and little to be trusted" he cannot, even in the creation and development of Florida's great citrus industry, be trusted to use a spray for his trees or a fertilizer for his land which contains a poison known as arsenic, because some men would use it in too great a quantity and too frequently, thus destroying the industry by ruining the fruit as a food and endangering the health of the public that consumes it. So an absolute prohibition of its use was necessary.

However, when the Federal Government, or the State Plant Board orders such fertilizer or spray to be used to destroy the Mediterranean Fruit Fly such legislative wisdom is suspended and fruit within the quarantined area may go forth to the market in jeopardy to the reputation of the fruit as an edible commodity, and the health of the people in whom a "toxic condition" may be produced from eating it and spraying with a preparation containing arsenic becomes no longer a violation of law. The answer avers that the use of arsenic in a spray is used "in order to produce a fruit which will be so artificially treated as to pass a maturity test sooner than otherwise the lusciousness, sweetness, palatability, nutritious quality, taste and juice content are so lessened and virtually destroyed as to create a definite prejudice against further fruits from Florida which are allowed to mature and ripen as nature intended."

Thus it is argued that in placing grapefruit from trees sprayed by an arsenic spray or fertilized by an arsenical fertilizer upon the market at the beginning of the season

"the market for the balance of the season is virtually destroyed because of the prejudice in the minds of the consumers," regardless of the quantity of arsenic used in either spray or fertilizer and the frequency of its application. It is also averred that the continued use of an arsenic spray of any quantity over a long period of time, "to-wit: five years or longer, will result in the destruction of the tree upon which it is used." It is also argued in the answer that if arsenical sprays used on citrus trees hasten the maturity of the fruit and increases its sugar content the growers in Texas and other parts of the world "will promptly begin to use the same, and thereby get their fruit to market as much sooner than the Florida fruit as is now possible."

In this argument the averred danger to health and the "toxic condition" produced in the consumer by such fruit, and the "prejudice in the minds of consumers" against fruit the trees of which have been so treated, seems to have been lost, because it is not reasonable to say that if such conditions result to the popularity and marketability of grapefruit the trees from which have been sprayed or fertilized with a spray or fertilizer containing "arsenic or any of its derivatives," that other growers in other parts of the world would follow the example of the "contentious and troublesome minority" which is represented in this cause.

It is also averred that the "root stock" used in producing grapefruit is as essential to good fruit as "soil or climate," and that the Texas growers use a "lime stock instead of a sour orange stock," which is ordinarily employed in Florida, and that it is not necessary therefore to use an arsenical spray on grapefruit trees to enable the Florida grower to compete with the Texas grower. It is also averred that the use of arsenic in sprays and fertilizers for grapefruit trees is done for the sole purpose of overcoming the tests which

have been devised to "determine when fruit is fit for consumption so as to protect the market as a whole." It seems to be averred that such tests are "based upon the natural process of nature, essential to produce fruit of proper quality." The answer contains a lengthy account of the transactions of the Legislature of 1933 relating to a proposition pending before it to amend or repeal the statutes in controversy. The answer admits that it is the intention of the Commissioner of Agriculture and the Inspector "to enforce the laws regarding this matter by seizure and destruction, which shall be carried out in exact accordance therewith," and denied that in so doing the constitutional rights of the complainants will be in any wise impaired or denied to them, or that interstate commerce will be impeded thereby.

The answer contains a motion to dismiss the bill of complaint on the ground that it is without equity and that the statute attacked is valid, and other grounds.

The cause came on to be heard on bill, answer, motion to dismiss, and certain exhibits filed before the Chancellor numbered from one to thirty-seven complainants' exhibits, and one to thirty-seven defendants' exhibits. The Chancellor granted the preliminary injunction prayed for by the complainants. The defendants entered an appeal from that order to the Supreme Court.

I have given a somewhat lengthy narrative of the averments of the answer to show the nature of the defense interposed to the relief sought.

The bill alleges in substance as grounds for the relief prayed that the complainants are grapefruit growers in Florida, and had, at some time during the progress of the present crop of grapefruit to maturity, either fertilized the ground upon which the trees grew or sprayed the trees

bearing the fruit with fertilizers or sprays containing arsenic.

The complainants attack the validity of Chapter 11844, Laws 1927, as amended by Chapter 14485, Laws 1929, *supra,* and secondly that the attempted application of it to the complainants and their property consisting of grapefruit, the trees bearing which have been sprayed with a preparation containing arsenic in a reasonable proportion to the bulk of the spray used and at reasonable intervals, is unlawful because it would deny to complainants rights secured to them by the Constitution of Florida, it would be an arbitrary invasion of private property, have no reasonable relation to the legitimate public purpose to be accomplished by the Act, and would be an unreasonable interference with private business.

It may be well to consider the history of the legislation attacked in which there may be discovered the motive for its enactment and the end to be attained, which to be valid must bear a reasonable relation to the public purpose sought to be attained and not a forced or strained relation, and that the interests of the public generally require the interference with the industry which the Act contemplates.

The citrus industry, if that term is applicable to the production of fruit for the market, has become a very large one in Florida. Many thousands of people are employed in it in one capacity or another, and many millions of boxes of fruit are disposed of in the market to consumers in Florida and to consumers in other States. By far the larger part of the crops is disposed of in interstate commerce to the people of other States. The producers of such fruit in this State are not without their competitors in Texas, California and Puerto Rico. Due to differences in climate and soil, and possibly to a lack of legislative re-

strictions in the matter of the cultivation of the fruit in other countries or States, the growers in Texas, California and Puerto Rico succeed in getting their fruit into the market of the United States a few weeks earlier than the fruit in Florida matures by processes of nature unaided by artificial means.

The assumed danger to the consuming public in the matter of health, and the possible resultant danger to the so-called industry by flooding the market with immature and unwholesome fruit, led to the enactment of a law forbidding the shipment of immature fruit deleterious to health. See Chapter 6236, Acts 1911.

That Act was attacked in Sligh v. Kirkwood, 65 Fla. 123, 61 South. Rep. 185, as being repugnant to interstate commerce regulations. The Act carried a penalty by fine and imprisonment, or both, for violating the provisions of the Act. The Act was upheld as being within the police power of the State in that it dealt with *deleterious* immaturity of fruit, and that it was not an infringement of interstate regulations of commerce as Congress had not by any congressional Act entered the particular field prohibiting or regulating the shipment of immature fruit. The Act was upheld as being in obedience to the police duty and power to protect the public health.

The case was considered by the Supreme Court of the United States. See Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. Rep. 501, 59 L. Ed. 835. Mr. Justice DAY delivered the opinion of the Court. In the course of his opinion he said: The single question presented is whether it is within the authority of the State to make it a criminal offense to deliver for shipment in interstate commerce citrus fruits—oranges in that case—which were "then and there immature and unfit for consumption." "It will be

observed," said the learned Justice, "that the oranges must not only be *immature,* but they must be in such condition as renders them *unfit* for *consumption;* that is, giving the words their ordinary signification, *unfit* to be *used* for *food."* Italics supplied. Continuing he said, Of course, fruits of this character, in that condition, may be deleterious to the public health, and, in the public interest, it may be highly desirable to prevent their shipment and sale."

The Court also held that immature fruit deleterious to health was not within the pure foods Act, although decomposed and putrid vegetable substances were. So it became established in Florida that the prevention of shipment not only in interstate commerce, but for local consumption of immature citrus fruit which was unfit to be used for food was a proper exercise of police power. The Florida case was decided by the Supreme Court of this State in February, 1913. Sligh v. Kirkwood, *supra.*

So in 1913 Chapter 6515 was enacted, without the approval of the Governor, which provided that oranges or grapefruit that contain less than 1.30% and 1.75% respectively of acid calculated as crystallized citric acid shall be considered mature, but if those fruits contained more than such proportions by weight of crystallized citric acid they shall be considered "immature and unfit for consumption," but that oranges or grapefruit showing an "average on the trees of one-half color, indicating ripeness, shall be deemed to be mature and fit for consumption" and may be sold without first being submitted to the acid test; that the enforcement of both Chapters 6236 and 6515 shall be under the general provisions, rules and regulations of the Pure Food and Drugs Law, Chapter 6122, Laws 1911. The Governor appointed the Citrus Fruit Inspectors under Chapter 6515, *supra.*

That Act was construed by this Court in the case of Moran v. LeJune, 78 Fla. 643, 83 South. Rep. 668. It was decided that the primary test of maturity was color, that the acid test was secondary and was not necessary where the oranges or grapefruit showed an average on the trees of one-half color. The Court said, when they meet the color test they will be deemed "mature and fit for consupmtion, and may be shipped or sold without being submitted to the acid test." The Court observing that the "Legislature recognized another condition that nature sometimes delays the application of her paint brush until after the fruit are fit for consumption, and gave the grower an opportunity to show that condition by the acid test provided for in the statute."

Sometime between the passage of the Act, Chapter 6515, *supra,* and the enactment of Chapter 10103, Acts of 1925, a practice of using arsenical sprays developed in some sections which had the effect of hastening the maturity of the fruit as indicated by color.

Chapter 10103, *supra,* was entitled "An Act to Prohibit the Sale or Transportation of Citrus Fruit That Is Immature or Otherwise Unfit for Consumption, and to Provide for Enforcement Thereof." By express provision in that Act the term "Citrus Fruit" applied only to oranges and grapefruit. The Act prohibited the shipment or sale of citrus fruit between August 31st and November 26th unless the same was accompanied by a "certificate of inspection and maturity," and between November 26th and August 31st, when inspection was not required, the transportation or sale of citrus fruit which was "immature or otherwise unfit for consumption" was forbidden.

This seems to be the first effort to make by legislative fiat the word "immature," as applied to citrus fruit, syn-

onymous in meaning with the phrase "unfit for consumption." The Act provided for the so-called acid test for grapefruit and oranges. The ratio of total soluble solids of juice to anhydrous citric acid decreased as the percentage of soluble solids increased in the juice of the fruit. The Brix Hydrometer was required to be used to determine the total soluble solids and the acid to be determined by titration of the juice, using alkali and Phenolphthalein as the indicator.

Then the Legislature enacted Chapter 11844, Laws 1927, and in 1929 amended it by Chapter 14485. Under Chapter 11103 the Governor appointed the Inspectors upon the recommendation of the Commissioner of Agriculture. In 1927 the Act was amended by Chapter 11875. By the latter Act the Commissioner of Agriculture was empowered to *employ* the Inspectors.

In 1931 the Legislature enacted Chapter 14662, which is a revision of the entire subject relating to the sale or marketing of citrus fruits, (by that Act extended to tangerines) which are not mature in accordance with the maturity standards provided for in the Act. The Act provided that it should not apply to the sale or transportation of citrus fruit for the purpose of canning said fruit. Full provision is made by that Act for inspection of the fruit for maturity through the agencies of the Commissioner of Agriculture and standards are prescribed by the Act by which it may be determined when citrus fruit may be deemed to be mature. The Act empowers the Commissioner to make and promulgate rules and regulations for carrying out and enforcing the provisions of the Act. Thus complete facilities exist under the authority of that Act for the protection of the citrus fruit industry of the State against the placing upon the market of citrus fruits,

oranges, grapefruit and tangerines which are immature according to the standards prescribed by the Act and are in fact unfit for human consumption.

The reason for the enactment of Chapter 11844, Laws of 1927, and the amending Act, Chapter 14485, Laws of 1929, was the assumption that an arsenic fertilizer used upon the ground where the trees are grown or arsenic spray used upon the trees bearing the fruit creates an unwholesome fruit unfit to be used as a food and deleterious to the health of the consumer. Such is obviously the purpose because the use of the arsenic spray or fertilizer is the gravamen of the offense, the basis for confiscation regardless of the mature or immature condition of the fruit and of the wholesomeness or unwholesomeness of the fruit as an article of food. The fruit may be mature and even meet the acid test prescribed by Chapter 14662, *supra,* and be wholesome as a food, but if the analysis by the chemist shows the fruit to "contain arsenic or any compound or derivative of arsenic" the fruit "shall be destroyed by the Inspector making seizure of the same or by any citrus fruit inspector or by the Sheriff."

Section one of the Act attempts to make unlawful the use of a spray or fertilizer except where ordered by the Federal Government or the State Plant Board for the purpose of destroying the Mediterranean fruit fly, and Section two attempts to make unlawful the sale or offering for sale, the transportation or delivery for market, any citrus fruit which shall contain any arsenic or any compound or derivative of arsenic except where the fruit comes from within a quarantined area for one year previous to time of gathering fruit. Not only do the two sections in the use of the terms "citrus trees" and "citrus fruits" embrace the fruits described in Chapter 10103, *supra,* of which Chapter 11875,

*supra,* is an amendment limiting the term "citrus fruit" to include only grapefruit and oranges, but they include all varieties of citrus trees and citrus fruits some of which, as the sour orange, are not used as food or included in the term marketable citrus fruits, though they may be transported, prepared for transportation or marketed. The two sections, therefore, are a mere dogmatic, arrogant, peremptory and unreasonable declaration against the use of arsenic or any of its derivatives in a spray or fertilizer to be used upon or about bearing citrus trees, or the sale or transportation of "any citrus fruit" which contains any arsenic or any compound or derivative of arsenic.

The validity of the two sections constitutes the basis for the other provisions of the Act which provide for the inspection of the fruit at any "packing house or other place where citrus fruit is being received or prepared for sale .and transportation," and which vest in the Inspector the power to test the fruit under the provisions of Chapter .10103, *supra,* an Act which was superseded by Chapter 14662, *supra,* and is not in force, and determine whether it shows "an abnormal and excessively high ratio of total soluble solids of the juice thereof to the Anhydrous Citrus Acid thereof."

The Act also vests in such Inspector, a person not re-.quired by the Act to possess any qualifications specially capacitating him for the employment, the power to seize and take possession of the fruit pending the procuring of a chemical analysis of the juice from samples of the fruit to be taken by him either from the packing house bins or elsewhere in the packing house, or from field boxes or vehicles delivering the fruit to the packing house, if, in his opinion, the preliminary test made by him shows "an abnormal and

excessively high ratio of total soluble solids of the juice thereof to the Anhydrous Citrus Acid thereof."

. The Act also attempts to establish a rule of evidence which chemical analysis disproves, that is to say, it provides that an "abnormal and excessively high ratio of total soluble solids of the juice (thereof) to the Anhydrous Citrus Acid" indicates the presence of arsenic in the fruit juice. That rule is unfounded in fact or reason, because the juice of non-arsenated fruit contains a trace of arsenic and the juice of fruit from the trees which may have been sprayed with a reasonable quantity of arsenical sprays shows no appreciable trace of arsenic in excess of what is normally contained in unsprayed trees, and certainly no trace of arsenic whatsoever in excess of the normal content in the fruit from trees which have been fertilized with a fertilizer containing arsenic.

Sections 5, 8 and 9 of Chapter 11844, *supra,* were not amended by Chapter 14485, *supra,* Section 5 provides for the seizure of the fruit by the Inspector, the submission of the samples to a chemist to be designated by the Commissioner of Agriculture, and makes it the duty of such chemist so chosen to make, a chemical analysis of the samples of juice submitted to him and make his report thereof to the Inspector, who is required to release the fruit "if (the) said analysis shall show that the said citrus fruit contains no arsenic." But the chemical analysis is bound to show even in non-arsenated fruit at least 0.00006 grains of arsenic per pound to 9.50% of soluble solids. The Pure Food and Drug Act of the Federal Government fixes the limit of arsenic tolerance in fruit deemed to be wholesome and fit for consumption as a food at 0.02, according to the allegations of the bill in this case admitted by the motion to dismiss. Section 8 of the Act attempts to render it un-

lawful for anyone to obstruct the Inspector in the performance of any duty required to be performed by him; and Section 9 prescribes penalties for the violation of any provision of the Act.

The Act is, in my view, an attempted exercise of the police power of the State in placing an unreasonable and arbitrary limitation upon the right of an individual to manage and operate his private business and an unusual and unnecessary restriction upon a lawful occupation. It vests in an employee of a State official the power to exercise vexatious and unlawful discriminations under the pretext of enforcing the law; makes the destruction of large quantities of property dependent upon an employee's reading of the report of a chemist of the State official's choosing; prescribes an impossible method of determining the actual presence of arsenic in the fruit seized; establishes an arbitrary, unscientific and wholly undependable rule of evidence as to the presence of arsenic in the fruit seized; leaves the determination of the existence of an "abnormal and excessively high ratio of total soluble solids 'of the fruit juice' to the Anhydrous Citric Acid thereof" to the opinion of a person of no special qualifications or abilities for deciding such a question; requires a test according to the provisions of an Act which has been superseded by a later one prescribing different standards, and attempts to make the criminality of the use of an arsenical spray or fertilizer depend upon the will or caprice of a State Plant Board, or some Board or Agency of the Federal Government.

The case of L. Maxcy, Inc., v. Mayo, 103 Fla. 552, 139 South. Rep. 121, did not determine the constitutionality of the Act in its entirety, but upheld the validity of the provisions of Section One only so far as it applied to the spraying of citrus trees with a spray containing arsenic.

As to the use of fertilizers the opinion vouchsafed some valuable advice to the Legislature for preventing the use of an arsenic element in fertilizer as applied to the soil. The reason for the suggestion seemed to be as expressed in the same paragraph, that if the statute be enforced to the extent it might be it would put a burden on a citrus grower to obtain a chemical analysis of all fertilizers proposed to be used by him on the soil around his citrus trees for fear that he might be sent to jail or have his fruit confiscated should he unwittingly use a fertilizer containing arsenic. So no decision was made as to that feature of the case.

It is most difficult to perceive how the limitation of a rightful exercise of the police power may be declared as applied to fertilizers containing arsenic, but not as to sprays containing the same element, when as the opinion states, the purpose of the entire Act is to avoid six harmful results to citrus fruits from the use of arsenic in fertilizers or sprays. The major premise of the argument in the opinion contains the fallacy that the use of sprays containing arsenic, or fertilizers containing that element, is generally practiced and is of a general and predominantly evil tendency, so that it is impossible to distinguish the evil from the innocent except as to degree. The Court cannot take judicial knowledge of such a fact, and the statement that it is a fact is wholly unsupported by experience, scientific research, and the evidence either in that case or the one at bar; while the Act itself contains the legislative declaration of the harmlessness of the practice, the lack of evil, and the fitness in fact of the citrus fruit for human consumption whenever in the opinion of a Federal agency or the State Plant Board the fruit trees may be sprayed with arsenic sprays, and the ground fertilized by arsenic fertilizers in the attack upon an insect pest.

The first opinion in that case approved that provision in the statute, which in effect was that the fruit industry was not injured, nor the health of the people jeopardized, nor the fruit unfit for consumption as an article of food when the arsenic was used to combat the assumed ravages of an insect which disappeared as mysteriously as it appeared.

The principle underlying the lawful exercise of the police power is that inhibitions of innocent acts or conduct cannot be made merely because to do so will more conveniently circumvent evasions of regulations which are within the legislative power to make, and that the determination by the Legislature of what is a proper exercise of police power is not final or conclusive, but is subject to the supervision of the courts, because the Legislature may not under the guise of protecting the public interests arbitrarily interfere with private business or impose unusual or unnecessary restrictions upon lawful occupations. The police power rests upon necessity and the right of self-protection, and private property cannot be arbitrarily invaded under the guise of police regulation, nor forfeited for the alleged violation of law by its owner, nor destroyed by way of penalty inflicted upon him without opportunity to be heard.

The validity of a statute of the sort under consideration is always open to the court to consider among other things whether the Act bears any reasonable relation to the public purpose sought to be accomplished, and a forced or strained relation is not enough. Mr. Justice Brown, of the Supreme Court of the United States, speaking for the Court, said: "To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon

individuals." Lawton v. Steele, 152 U. S. 133, 38 L. Ed. 385, 14 Sup. Ct. Rep. 499; Schlesinger v. Wisconsin, 270 U. S. 230, 70 L. Ed. 557.

The case of *Ex Parte* Kilgore, 106 Fla. 723, 143 South. Rep. 610, merely decided that the spraying of citrus trees with arsenic prior to December 6, 1931, will not support criminal prosecution if done in a quarantine area.

The opinion in the case of Kilgore v. Mayo, 54 Fed. Rep. (2nd) 143, in quoting the opinion of the Supreme Court of the United States in Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. Rep. 501, 59 L. Ed. 835, inadvertently perhaps supplied the disjunctive "or" for the conjunctive "and." The language of Mr. Justice DAY was as follows: "It will be observed that the oranges must not only be immature, but they must be in such condition as renders them unfit for consumption; that is, giving the words their ordinary signification, unfit to be used for food." That is very different from the statement that in that case the Court held that it was within the police power of the State to "prevent shipment of citrus fruit that is immature or unfit for consumption in order to protect a great industry."

I fully concur in the conclusions reached by Mr. Justice BUFORD and Mr. Justice BROWN in the opinions prepared by them, and adhere to the views expressed by me in my dissenting opinion in L. Maxcy, Inc., v. Mayo, *supra*.

The evidence submitted in this case by both complainants and defendants is overwhelmingly conclusive as to the unreasonable and unlawful execution of the threatened acts of the defendants. It completely justified the opinion and decision of the learned Chancellor in this case, which should be affirmed.

BROWN and BUFORD, J. J., concur.

BROWN, J. (concurring specially with Justices ELLIS and BUFORD).—The Chancellor in the court below wrote a very

able opinion in this case, and I think it might be well to here quote certain material paragraphs from his opinion, which, to my mind, are sustained by the evidence in the case.

"It is suggested at the very beginning of this hearing that the matter is *res judicata,* and that the decision of the Supreme Court of Florida, in the case of Maxcy v. Mayo, has definitely and finally decided this matter, and that it is no longer a proper subject for litigation. If the court felt that such was the case, it would unhesitatingly deny the application for the temporary injunction, because it is the policy of this court, insofar as possible, to ascertain the rulings and orders of the Supreme Court of Florida; to follow same in all opinions and adjudications in this court. But it seems to me that this matter, as it is now brought before this court, is an entirely different case from that presented to the Supreme Court of Florida in the case of Maxcy v. Mayo. In the first place, many of the questions raised in this cause were not raised at that time, even if they might have been. That cause was of such a nature and brought in such a manner that some of the material points involved in this cause could not then have been decided in that case; and in the second place, the development of additional and different facts, which are set out in the bill of complaint and established in the evidence, show to my mind that even if the arsenic statute in question had been held constitutional at that time against any and all attacks that might have been made against it, nevertheless the court would be justified at this time, and under the facts as they now exist and are now established, in holding the arsenic law unconstitutional. There is ample authority in the decisions of the State courts and in the decisions of the United States Supreme Court to support the proposition that even though a statute has been held

constitutional by the courts of last resort, it is proper and oftentimes necessary for a court to subsequently hold the said statute unconstitutional, when attacked by a different interest or in a different way, because of additional facts developed that did not exist at the time of the previous decision, and/or because changed conditions and additional facts have rendered the law unconstitutional in operation. It is my view, therefore, that this case as presented today must necessarily be considered on its merits in the light of facts and circumstances as they now appear and have now been developed, and that the case of Maxcy v. Mayo, therefore, is only authority for the constitutionality of the statute insofar as it affects such points and questions in the present suit as may have been directly involved and passed on in that case, and as to which there is not new information, or altered conditions, warranting a different holding.

"In this connection it might be well to correct an impression that it seems the answer and the defendants seek to establish, to-wit: that this is a suit by a small and vexatious minority, who are always objecting to any restrictive or regulatory law on the subject. It is clearly established beyond any question that this is a misconception of the situation and of the case, and that this suit is brought and sponsored by a great bulk of those interested in the grapefruit industry, representing approximately four-fifths of the grapefruit industry at least; and that those sponsoring this suit are, for the most part, made up of those honest, conscientious and able representatives and owners of the grapefruit industry, who, at the time of the decision in the case of Maxcy v. Mayo, were led to believe, and did believe, that the arsenic law was good and should be sustained; but who have since come to the conclusion that

they were in error, and that the industry will be destroyed unless the arsenic law is eliminated.

"When men like John Snively and John Taylor, vice-president and president, respectively, of the Citrus Exchange, A. H. Blanding, member of the State Plant Board, Jim Morton, vice-president of the Clearing House, and Dr. Harris, a member of the Committee of Fifty, come into a suit of this kind, speaking as they do for a great bulk of the citrus industry, as well as the still greater majority of the grapefruit industry, it can be no longer correctly said, or intimated, that this is a suit by and on behalf of a vexatious and not-worthwhile minority."

"I cannot conceive of the great bulk of grapefruit growers, who are now desirous of using a limited amount of arsenic for the purposes mentioned, attempting to eliminate the arsenic law if there was the slightest possible danger of the grapefruit market being thereby in any way injured, or the grapefruit industry being in any wise injured, or the quality of the fruit being in any wise injured, because, of course, if the quality of the fruit was injured, then it necessarily follows that the market would be injured to that extent, and it appears to the court, therefore, and the court finds that the use of arsenic in limited quantities necessary to hasten the maturity of grapefruit, so as to give the grapefruit industry a chance to compete with that from other sections of the world, would in no wise injure the fruit or the market for the fruit, but would on the other hand enable the Florida grapefruit to better compete on the market with outside sweet grapefruit, and in addition would extend the season for grapefruit shipping so that the grapefruit could be better prorated over a longer period of time and thus prevent, to that extent, a glutting of the market, which now exists in the latter months of the season."

"Much has been said about the amount of arsenic to be used, but it seems to me that the evidence established that the small amount of arsenic necessary to be used is clearly much less than the tolerance permitted by the United States Government, and that it could not and would not place as much arsenic in the fruit as is now allowed in fruit and vegetables by the United States Pure Food Laws. It also readily appears that the use of more than the small amount of arsenic required to hasten maturity of the fruit would do no good and serve no purpose whatever for the grower, and would not add anything to the hastening of the maturity of the fruit, but would, by lowering the juice content, bring the fruit under the requirements of the immature fruit law, and consequently it is absurd that the grower would use more than the limited amount necessary and impose that additional expense and handicap on himself. I mention this because it is contended that unless we have the arsenic law preventing all arsenic there would be no way to prevent those in the industry from using too much arsenic. Be it remembered, also, that the record clearly establishes that there are no anti-arsenic laws either in California or Texas, and it is contended, and written into the record by letter from those sections, that the people can be trusted not to use arsenic, and that they don't use arsenic. It is a matter of common knowledge in the citrus industry that the reason they do not use arsenic is because their soil, being such that it matures the fruit early and makes a sweeter fruit, (which seems to be in demand in the market), just as an application of a limited amount of arsenic would enable Florida grapefruit growers to produce, consequently there would be no need or incentive, or motive, for the growers of Texas and California to use arsenic. If the citizens of those two states can be trusted not to do that which would injure them, I am confident

the growers of Florida are just as good citizens and have just as much sense, with reference to the protection of their industry, as have the citizens of California and Texas, and that the people of Florida could be trusted not to use arsenic when not necessary, and not to use more arsenic than would be of value to them, in lengthening their season and producing a quality of sweet grapefruit that would enable them to compete with those outside sections.

"Just here I should like to mention the suggestion that the effect of the application, of the small amount of arsenic necessary to hasten the maturity of grapefruit to the required extent, will render the fruit injurious to health. It seems to me that the evidence in this case establishes that the small amount of arsenic necessary to be used, and which would be used on the grapefruit to produce the desired results, would in no wise damage the fruit or render it injurious to health. For instance, the pamphlet published by Nelson & Mottern, introduced in evidence in behalf of the defendants, sets forth the following:

" 'It seems desirable to make it clear that there is little danger of consumption of arsenic when eating fruit from sprayed trees—there is no detectable increase in arsenic in the juice, or pulp, of oranges from sprayed trees over that found in those from unsprayed trees.'

"The only other way in which the health factor is involved consists in the fact that certain foods, including fruits, are prescribed as a medical diet, because of certain vitamin properties they are supposed to possess. The theory is held by some that the vitamin properties are impaired by the use of arsenic as a spray on citrus trees, especially vitamin C. It does not appear to the court that the evidence introduced in this cause would warrant any assumption that any finding made with reference to oranges would apply to grapefruit, and so far as grapefruit is con-

cerned, there is no recognized accepted medical opinion on the subject. On the other hand it appears from the affidavit of Dr. Boulware that grapefruit as distinguished from oranges is not generally prescribed as a medicinal diet for its vitamin properties, and that there are no published experiments as to grapefruit * * *.

"If anything more were needed to demonstrate that the danger to public health from the prohibited use of arsenic was not in the legislative contemplation, it is sufficient to point out that there is no statute forbidding the spraying with arsenic of other fruit and vegetable products which are extensively produced in Florida. Celery, strawberries, lettuce, tomatoes, are all sprayed with arsenic, and in such use the poisonous substance is sprayed directly on the edible portion. It is a fact well known, too, that tomato juice is prescribed as a medical diet largely for its vitamin C property; yet it has not been suggested that spraying tomatoes with arsenic impairs its food or medicinal value. Furthermore, the very Act in question, Chapter 11844, does not prohibit dusting with arsenic and does not prohibit the use of arsenic as a fertilizer. It is now known that fertilizing with arsenic through the soil has no appreciable effect, while dusting with arsenic is just as effective as spraying. These considerations show conclusively that the legislation was a mere experiment, and in the light of knowledge possessed today, wholly deprives the statute of the presumptions arising from legislative determinations.

"However, it seems to the Court that the question of whether or not the statute is constitutional under the police power on the ground that the Legislature had a right to prohibit the use of arsenic on the ground of public health, has no place in this suit, because, while ordinarily where a statute totally prohibits the use of any ingredient under all

circumstances, it may be presumed that it is done on the basis of public health, the arsenic statute of Florida expressly negatives any possibility, or presumption, that it might have been enacted for the purpose and should not, therefore, be considered a legislative determination that the use of arsenic, in any amount on fruit, rendered the fruit injurious to health. The arsenic law expressly allows the shipping of arsenated citrus fruits regardless of the amount of arsenic used where the use of arsenic has been ordered by either the Federal or State Governments, and the Supreme Court of this State has held that fruit so sprayed could be shipped under the law."

"And that simply amounts to this: the law says if the spraying is ordered by either the Federal or State Government, no matter how great the quantity of arsenic used, the fruit may be shipped and sold to the consumer, but that if it is put on by the individual owners of the grove, without such legal authority, it cannot be shipped. And the record discloses that when the Government was spraying to dispense with the insect pest, arsenic solutions, perhaps eight or ten times as strong as that properly to be used for the early maturity of fruit, was sprayed upon the trees, and that it was sprayed on them about every ten days, instead of about twice per season, as is necessary for the hastening of the maturity of the fruit. To say, therefore, that the Legislature intended to pass this particular Act because arsenic in any quantity in fruit would be injurious to health is to say that the Legislature intended to adjudicate that citrus fruit sprayed frequently and heavily with arsenic under the direction of the Government is all right for public consumption and healthy, and that sprayed lightly and infrequently without instruction from the Government is unhealthy.

"Such a contention, it seems to me, in the face of the

inhibition in the statute itself, is untenable. It would be unreasonable to assume that the Legislature would have permitted the shipping of such fruit if the Legislature had determined or was determining, that such fruit was injurious to health. It must follow, therefore, as a matter of reason and from a matter of common knowledge, and from the evidence in this record as to why such statute was passed, that it was passed solely and only because it was deemed by the Legislature to be necessary at that time to prevent its use because at that time it appeared to make it possible and to make it probable that it would enable certain growers to get on the market a dry and juiceless fruit, prematurely sweetened, so as to pass the sweetness test, but yet not fit for consumption, and thereby injure the market, be a fraud on the buying public and consequently injure the industry itself. In other words, that it was passed as a determination that it was necessary at that time to have that law for the benefit of the industry as a whole through the protection of the markets against immature fruit.

"Subsequently, however, in 1931, a statute was passed, which is mentioned but not otherwise considered in the case of Maxcy v. Mayo, fixing a juice content requirement for grapefruit and other citrus fruits, which eliminates, according to the evidence in the case, the possibilities of dry, green and unpalatable fruit being placed upon the market and thereby injure the market, which the arsenic law sought to prevent at the time the arsenic law was passed, and at which time there was no juice content law. It is, also, apparent from the record that after the passage of the said 1931 Act, providing for an ample juice test, it would be no longer possible to have such dry, immature and unpalatable fruit, and that the only effect of arsenic after that time would be to hasten the maturity of the fruit and permit the placing on

the market during the earlier months of the season of a sweeter fruit, which would necessarily have to be a good and palatable fruit; otherwise, because of the new requirements of the 1931 Act, it could not be shipped. At the time of the passage of the said arsenic law, there being no juice content requirement in the law, the effect of arsenic was merely to make the fruit sweet enough to pass the other then-existing tests before it would have sufficient juice content to be palatable and salable fruit. For these reasons it seems to the Court that the statute itself precludes any possible consideration of the fact that it could have been passed as an exercise of the legislative rights under the police powers to protect the public health and welfare."

One of the exhibits introduced on behalf of the Commissioner of Agriculture was a technical bulletin No. 350 issued by the United States Department of Agriculture entitled "The Effect of Lead Arsenic Insecticides on Orange Trees in Florida," prepared by Miller, Bassett and Yothers in February, 1933. In that report among other things it is said:

"Only a trace of arsenic was found in a liter of orange juice when a tree had been given thirteen one-quart applications of fruit-fly bait spray at ten-day intervals. This mixture contained eight pounds of lead arsenic per 200 gallons. Eighteen daily applications of lead arsenate of the same quantity and the same strength were applied with the same result.

"Arsenic as arsenic trioxide ($As_2 O_3$) was found to the extent of 0.01 to 0.16 mg per liter of juice when 17 applications of five gallons of bait spray were made at ten-day intervals. Since the quantity of arsenic found in a liter of juice when the trees were very excessively sprayed was only a small fraction of a minimum medicinal dose, the juice

from fruit trees normally sprayed could be in no way toxic for human consumption."

Among the exhibits introduced in behalf of the complainants was an affidavit by Hon. John S. Taylor, well known throughout this State as a man of rugged honesty, high character, and as one of the most experienced and successful citrus growers in the State. His affidavit reads a follows:

"My name is John S. Taylor. I reside at Largo, in Pinellas County, Florida; I am now and have been for 35 years a grower and shipper of citrus fruit; I have been a member of the Florida Citrus Exchange for eight years, and am now President of the Florida Citrus Exchange.

"I was a member of the Florida State Senate for the sessions of 1921, 1923, 1925 and; 1927. I was President of the Senate in 1925 sessions, and the session of 1927, at which was enacted Chapter_____, known as the Anti-Arsenic Law. I was a member of the Special Citrus Committee of the Senate which had the consideration of the passage of that law and other bills affecting the citrus industry.

"At the time Chapter_____ was enacted the effect of spraying trees with arsenic was largely an unexplored field; the industry had been suffering for a great many years from the acts of a number of unscrupulous shippers who persisted in shipping immature fruit, the character of which was concealed by artificial coloring; the effect of such was to put in disfavor with the trade, so that Florida fruit, that came on the market later in a mature and ripened state, did not have the favor nor command the price that its merit and worth entitled it to. It was because of this adverse effect on the industry as a whole that the State of Florida undertook to legislate against the shipment of

immature fruit; the whole purpose of such legislation has been the protection of the industry; the question of protecting public health was secondary. The Legislature of 1911 enacted the first law against immature fruit, Chapter 6236, Acts of 1911; that law did not prescribe any standard of maturity, so the session of 1913 enacted Chapter 6516, which prescribed the color test and the acid test. The next legislation was Chapter 10103, Acts of 1925, enacted during the session when I was President of the Senate. That law based the maturity standard on the percentage of soluble solids of the juice and the ratio of soluble solids to citric acid. By the time the session of 1927 came into being the practice had commenced in some sections of spraying with arsenic, which had the effect of enabling fruit so treated to pass the maturity test. The practice was not widespread, and research into the field had not then shown what the effect would be on the fruit; but it was the general feeling in the industry that users of arsenic were producing a fruit by such use that, while it passed the standards fixed by law, was nevertheless immature in fact, and in fact injurious to health. Accordingly the Legislature of 1927 enacted the Anti-Arsenic Law, Chapter 11844, and also Chapter 11875, amending and strengthening the provisions of Chapter 10103, Acts of 1925, the law against immature fruit. At that time it was believed that arsenic treatment of fruit by spraying the trees caused the fruit to become impregnated with arsenic and injurious to consumers. Also, it is a fact that at that time, the grapefruit produced in Texas and other sections had not begun to come into competition with Florida grapefruit to any great extent, and it was not then realized, as it is now known, that the use of arsenic spray as a means of stimulating and hastening the maturity of grapefruit would be essential in order for the Florida grow-

ers to compete with Texas and other sections producing an early-maturing fruit.

"Since the enactment of Chapter 11844, the Anti-Arsenic Law, I have kept in close touch with the fruit situation and have kept posted on the results of research, study and experiment in the use of arsenic spray. I have found that the use of arsenic as a spray on trees, in reasonable quantity, that is for the purpose of stimulating maturity, does not cause any residual quantity of arsenic to appear in the fruit itself, such content being practically non-existent; that it would be a physical impossibility for a person to consume enough fruit so treated as to obtain a toxic dose of arsenic; that the effect of arsenic on the fruit is felt entirely through the increased respiration of the foliage, and the effect is to inhibit the formation of citric acid and lower the citric acid content, thereby enabling fruit so treated to meet the acid test of maturity by law.

"The question whether the fruit is rendered insipid is entirely one of individual taste; Texas grapefruit by nature has a lower citric acid content than most of the fruit grown in Florida, and the question whether it is more or less appetizing as a result thereof, depends on the taste and preference of the consumer but it is a fact that the Texas industry advertises the sweetness of its product as one of its strongest selling features, and it is also a fact that in the past few years, Texas grapefruit has virtually captured certain markets from the Florida product.

"Because of these conditions, which are now known to exist, and because I feel that the continued prosperity of the grapefruit industry is at stake, I have become convinced that the reasonable use of arsenic spray as a means of accelerating the maturity of grapefruit is not only not injurious to the industry, but on the contrary the continued en-

forcement of the anti-arsenic law is threatening the life of the industry. The acceleration of maturity of grapefruit by this means is necessary not only to enable Florida growers' to reach the early market and compete with other sections, but it would lengthen the marketing season six weeks or two months and afford a greater spread for the absorption in the markets of the country of the productions of the industry.

"For these reasons, I am convinced that the Anti-Arsenic Spray Law is an unreasonable restriction on the industry, that it does not benefit the industry as it was designed and hoped, but it is a positive detriment to the industry."

In addition to the above affidavit there were a number of other affidavits of a similar nature signed by men prominent in the citrus industry in this State, introduced by the complainants; also a number of affidavits expressing views to the contrary introduced by the respondents.

But the scientific evidence introduced in behalf of the respondents, the Commissioner of Agriculture, and Charles P. Davis, Chief Fruit Inspector, show that the normal use of arsenical sprays, while it may lower the vitamin C properties of oranges, does not render the fruit, or the juice in the slightest degree injurious to the health of the consumer.

As shown above, by the bulletin of Miller, Bassett and Yothers, after the very heavy spraying of orange trees at ten-day intervals with arsenical sprays, the quantity of arsenic found in a liter of juice was only a small fraction of a minimum medicinal dose, and that "the juice from fruit trees normally sprayed could be in no way toxic for human consumption."

There was also introduced before the lower court, in behalf of the Commissioner of Agriculture, a paper read before the American Public Health Association, in September,

1931, prepared by Messrs. Nelson and Mottern, of the Bureau of Chemistry and Soils of the Department of Agriculture at Washington, which was quoted from in the opinion of the lower court, in which they say that "There is little danger of consumption of arsenic when eating fruit from sprayed trees." In another part of their paper, Nelson and Mottern also say "Samples of the juice and pulp from the heavily sprayed and unsprayed oranges were examined for arsenic by the Gutziet Method, but this was not present in more than the mere traces present in most food products." They also said, "There is no detectable increase in arsenic in the juice or pulp of oranges from sprayed trees over that found in those from unsprayed trees."

The evidence also shows that oranges are more sensitive to the use of arsenical sprays than grapefruit, and certainly if the use of such sprays does not increase the arsenical content of the edible portions of oranges it is hardly probable that it would do so in the case of grapefruit. Indeed, the experiments thus far made by the chemists and scientists indicate that the use of arsenical sprays does not increase the arsenic content of grapefruit, and there is no evidence to the contrary. It appears from the evidence that there is some arsenic naturally produced and contained in practically all fruits and vegetables, but the evidence in this case on the application for temporary injunction, which is quite voluminous, each side submitting thirty-seven exhibits, leads to the irresistible conclusion that so far as science has thus far gone, there is not the slightest evidence that the normal commercial use of arsenical sprays increases the arsenical content of grapefruit, or renders it in any way deleterious to the health of the consumer, and there is no evidence based on scientific experiments to the contrary.

The evidence does show that the use of arsenical sprays

on grapefruit, and oranges, retards and reduces the percentage of citric acid, and increased the ratio of the sugar content as related to the acid content, thus hastening the maturity of the fruit from a month to six weeks; but the overwhelming weight of the evidence shows that this does not render the fruit less palatable or in any way affect it deleteriously in so far as the effect on the health of the consumer is concerned. The Act under review recognized this fact, because it expressly authorizes the sale and marketing of citrus fruits upon which arsenic as a fertilizer or spray has been used under the orders of the Federal Government or the State Plant Board. See dissenting opinion of Mr. Justice Ellis in Maxcy v. Mayo, 139 So. 121, 132.

Section two prohibits the sale, transportation or marketing of any citrus fruit which shall contain "any arsenic, or any compound or derivative of arsenic," except fruit coming from a quarantined area. This section of the Act as written is either unconstitutional, or it is probably unenforcible. If under this section, construed just as it is written, the Commissioner of Agriculture could prohibit the marketing of any fruit containing "any arsenic, or any compound or derivative thereof," it would apparently give the Commissioner the power to destroy the citrus fruit industry of this state at will. If on the other hand the statute is construed to mean that arsenic thus found by the Commissioner or his inspector by the chemical analysis provided for in Section four of the Act shall be such an abnormal amount of arsenic as to indicate the use of arsenical sprays, it would appear from the above quoted evidence of the Commissioner's own expert witnesses in this case, that there is probably no known method of chemical analysis by which this section of the Act could be enforced if given such construction. For as we have seen above, the expert evidence

introduced in behalf of the Commissioner was that "There is no detectable increase in arsenic in the juice or pulp of oranges in sprayed trees over that found in those of unsprayed trees." And the evidence does not show any method of chemical analysis for detecting arsenical content in grapefruit which varies from that used in detecting such content in oranges. So it appears that even if Section two of the Act should be held constitutional it would probably be impossible to enforce it.

We are of the opinion that the probative weight of the evidence submitted to the Chancellor upon the application for the temporary injunction justified the Chancellor in his conclusion that *the use of arsenical sprays upon grapefruit in the ordinary and usual course by growers in this State does not render the fruit deleterious to health, nor does it have any injurious effect upon the marketing of Florida cittrus fruits.* If these conclusions on the facts were justified by the evidence, the further conclusion of the Chancellor that the act in question *was not constitutionally applicable to grapefruit* was also justified. It follows that this Court would not be warranted in reversing the order of the Chancellor granting the temporary injunction.

The validity of nearly all police regulations of this nature depends upon the facts. The real question here involved is mainly one of fact. For instance, if the Legislature were to pass an Act prohibiting the use of bicarbonate of soda and phosphoric acid in the making of biscuit or other bread made for sale, and if upon attack in the courts it should be made to appear by the evidence that the use of such ingredients was in no way deleterious to health or to the marketability of the product, the courts would unhesitatingly declare such an Act invalid as an arbitrary and unreasonable exercise of the police power, invading the constitu-

tional rights of the individual and the 14th Amendment to the Federal Constitution. The general principles of law governing the validity of police regulations was well stated in the case of Maxcy v. Mayo, 103 Fla. 552, 139 So. 121. But the facts developed by the record now before us are quite different in many respects and require a different conclusion *as to grapefruit,* unless upon final hearing in this case on pleadings and proof the appellants can successfully rebut the evidence introduced by the appellees in the court below and show a different state of facts from those on the record as it stands before us now. But, whatever the final decision of the Court may be on final hearing upon pleadings and proof, we cannot say on the record before us that the Chancellor erred in granting the temporary injunction.

It follows that the order appealed from should be affirmed.

BUFORD and ELLIS, J .J., concur.

BUFORD, J.—(Concurring specially with Justices ELLIS and BROWN):

After careful consideration of this case, and again considering the case of Maxcy v. Mayo, 103 Fla. 552, 139 Sou. 121, I am unable to concur in the conclusions reached by the majority of the Court.

It now appears to me that Mr. Justice ELLIS expressed the proper view as to the validity of the Act under consideration in the dissenting opinion prepared by him in Maxcy v. Mayo, *supra,* and that, therefore, the holding of the Court in that case that the Act is valid should be overruled in the light of the record which is now before us in this case.

It appears to me that the reasoning adopted in the majority opinion must lead to the conclusion that Section 1 of the Act is invalid because of being in conflict with Sec-

tion 1 of the Declaration of Rights of the Florida Constitution. I cannot conceive that the Legislature has authority to denounce as a criminal offense an Act which is conceded to be harmful to no one and which may be beneficial to the property of the perpretator of. the Act.

· If the remainder of the Act had been so written and passed as to apply only as it is construed to apply in the majority opinion, then I could probably agree that the Act is valid, but, the majority opinion, as I read it, rewrites the statute, in applying the construction which is there given. The Act itself is vague, indefinite, uncertain and unreasonable and even with the favorable construction acceded to it by the majority opinion, it remains indefinite and uncertain because there is no standard either in the Act or in the opinion fixing the maximum arsenic content or defining the character or arsenic content which the fruit may contain without being subject to seizure and destruction. It is admitted that all the fruit possess some arsenic content and it does not appear to me that the guarantee of due process of law could be realized where the statute prohibits no arsenic content; the evidence shows that practically all the fruit involved has some arsenic content and it is left to the caprice, judgment or opinion of some individual to determine the maximum content of arsenic which the fruit may possess without being subject to seizure and destruction.

Certainly, the State, through its Legislature, may prohibit the sale of fruit for human consumption which has been adulterated, which is misbranded or which for any reason may be injurious to health, but it must fix some sort of standard by which the extent of content of the obnoxious substance is to be determined.

As I read the record, the great preponderance of the evidence shows that no difference can be determined by chem-

ical analysis, so far as the content of arsenic is concerned, between the fruit which has not been sprayed with arsenic and that which has been sprayed with arsenic and upon this evidence being taken as expressing the fact, there can be no reason for upholding the statute, nor for that matter, for the making of a chemical analysis to determine the arsenic content.

It is contended that by the opinion and judgment of this Court in Maxcy v. Mayo, *supra,* this Court has forever settled the question of the constitutional validity of the Act. The opinion of the Supreme Court of the United States in the case of Abie State Bank v. Bryan, 75 Law. Ed. 690, establishes the contrary of this contention. The only theory upon which we could accept that contention is that it is the duty of appellate courts to correct the errors of inferior courts while perpetuating their own. This we do not concede. When an appellate court or judge is convinced that its, or his, former holding is erroneous such error should be as far as possible immediately pointed out and corrected.

It appears to me that the order of the Chancellor was based upon findings amply supported by the record and that it should be affirmed.

ELLIS and BROWN, J. J., concur.

#### ON PETITION FOR REHEARING

PER CURIAM.—The situation in which this Court finds itself in undertaking to decide this appeal by a divided Court is unusual, but not without precedent in the jurisprudence of this State.

In Burnett v. Green, 97 Fla. 1007, 122 Sou. Rep. 570, an attack was made on the constitutionailty of Chapter 6458, Acts of 1913, commonly known as the general drain-

age law. The case was heard by the Circuit Court of Hills-borough County on an application for a preliminary injunction. The injunction was granted on the circuit court's finding that the statute involved was unconstitutional. That case, like this one, was heard on bill, answer and testimony taken on the preliminary injunction application. When the case was first brought to this Court on appeal from the interlocutory injunction order, the Justices of this Court were equally divided not two, but three, ways, on the proposition whether or not the injunctional order should be affirmed. And upon such three-way division of this Court, an affirmance decree was entered. Thereupon the case was remanded for final adjudication on its merits. Later the circuit court on final hearing did decide the case on its merits. In the final decree, the circuit court again decided that the statute was unconstitutional. But upon an appeal from the *final decree,* this Court reversed the conclusion reached that the statute was invalid, despite the fact that it had previously affirmed the interlocutory order granting a temporary injunction in the same identical case on the ground that the statute was unconstitutional. Burnett v. Greene, 105 Fla. 35, 144 Sou. Rep. 205. See also State *ex rel,* Buford v. Watkins, 88 Fla. 392, 102 Sou. Rep. 347 for a similar case.

Every statute not obviously bad on its face, is *prima facie* constitutional, and is enforceable as such by the executive department of the government.

But where a statute is not averred against as being unconstitutional on its face, but is nevertheless challenged as to its constitutionality *as applied to a special factual status claimed to exist* (for example as in Weaver v. Palmer Bros. Co., 270 U. S. 402, 46 Sup. Ct. 320, 70 L. Ed. 654) the ultimate constitutionality of the statute may often times be

judicially determinable only upon the factual showing made at the final hearing.

The rule seems to be well established that a chancery court on an application for a temporary injunction presented on bill, answer and affidavits, may reach the conclusion that the complainant has made out such a strong showing of probable unconstitutionality of application of a given statute alleged to be in conflict with justiciable constitutional rights relied upon by complainant for permanent relief against the enforcement of the statute challenged, as to warrant the granting of a temporary injunction on that ground alone, to stay the enforcement of the statute *pendente lite,* when otherwise the enforcement of such statute *pendente lite* might result in the imposition of enormous penalties, or the forfeiture of valuable property rights, for which no redress could be later had for the injury done.

If this were not the rule, citizens affected by unconstitutional laws carrying severe penalties of fine, imprisonment or forfeiture of rights of property, might be so intimidated as to entirely preclude any resort to the courts at all for testing the validity of the statute, for fear of the penalties and forfeitures that might be imposed upon them in case the court should decide that the law was valid. So where the result would be the complete denial of a right to be heard on a constitutional question, by making resort to defenses at law so attendant with risk of fines and enormous forfeitures as to intimidate observance of the alleged unconstitutional law in order to avoid the likelihood of severe punishment for non observance, a court of equity may grant a stay of enforcement of the alleged unconstitutional statute, until such time as it may more fully investigate the facts of the case necessary to enable it to reach a final adjudication. See Ex Parte Young, 209 U. S. 123, 28 Sup.

Ct. Rep. 441, 52 L. Ed. 714, and Florida East Coast Ry. Co. v. State, 79 Fla. 66, 83 So. 708.

In this case the order appealed from is temporary in character and as such, is subject to future modification or dissolution by the court that granted it, should equitable principles require it, though it has been affirmed here on appeal. Such order embraces two phases of complainants' case (1) its right to relief by injunction temporary in character, (2) its right to permanent relief because the statute is unconstitutional. The fact that the Chancellor incorparated in his order a finding that the statute was unconstitutional in its application to grapefruit does not finally and conclusively determine that question insofar as it may be presented on final hearing of the cause, unless the court not only affirms the order made, but affirms it to the extent of adjudicating the constitutional question on this interlocutory appeal.

Ordinarily the constitutional question would be the sole question adjudicated by this Court in a case of appeal from an order holding a statute invalid and enjoining its enforcement. But the fact that the Court is equally divided on the constitutional question as it is presented on the record now before us, precludes a final decision by this Court on the constitutional question at this stage of the proceeding.

But the fact that the Court is evenly divided on the decision now to be made on the *constitutional* question, does not preclude the application of the rule of State *ex rel.* Hampton v. McClung, 47 Fla. 224, 37 Sou. Rep. 51, to the order appealed from insofar as it may be dealt with in its aspect simply as a discretionary order in chancery granting an injunction to preserve the asserted rights of the parties complainant *pendente lite*.

None of the Justices participating in the decision filed

Monday, October 2, 1933, has receded from the views then severally expressed. So the Court remains evenly and permanently divided on the constitutional question insofar as the present record and the present appeal is concerned. But this does not finally end the litigation as would be the case if a majority of the Court could agree on the present appeal that the statute is or is not unconstitutional in its application to grapefruit. So there is no alternative for this Court than to deal with such judicial *impasse* by affirming the interlocutory injunction simply in its aspect as a discretionary injunctional order and defer until consideration of the case on final decree, any further attempt to decide the constitutional question. This procedure is directly in line with the authorities cited to this Court at the oral argument on the application for a reinstatement of the constitutional writ dissolved at the time of Monday's decision.

Should the case be again brought here on an appeal from the final decree, it would then come here accompanied by a finding of facts on final hearing that would be *res adjudicata* as to the factual situation relied on as constituting a basis for holding the statute unconstitutional in its application to grapefruit. But such finding of facts would have to then be considered in the light of what has recently been set forth as the rule controlling conflicting presumptions in such cases, between the presumption in favor of the correctness of the Circuit Court's judgment as opposed to the presumption in favor of the statute.

The rule referred to was recently stated in excellent fashion by Mr. Justice ELLIS in the case of Spencer v. Hunt, 109 Fla. 248, 147 Sou. Rep. 282, as follows:

"In cases of this nature where the court of original jurisdiction declares an act of the Legislature to be in conflict with the Constitution, the presumption does not obtain in

the appellate court as in other cases on writ of error from this court that the judgment of the trial court is accurate. Obviously no such presumption can exist because the question of the validity of the Act is presented directly for determination by this Court and the presumption obtains in favor of the constitutionality of the Act, which may not be held bad unless the Court is convinced beyond a reasonable doubt of its invalidity. See State v. Bryan, 50 Fla. 293, 39 So. 929; Hayes v. Walker, 54 Fla. 163, 44 So. 747."

Under the circumstances, none of the Justices receding from the several positions heretofore taken, there is nothing the Court can do but allow the decision of October 2, 1933, to stand and the petition for rehearing, and for decision at this time on the constitutional question, to be denied, and it will be so ordered.

Rehearing denied.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL, BROWN and BUFORD, J. J., concur.